D2ekches                          SENTENCE

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4             v.                          10 CR 918 (RPP)

 5   VADIM CHERVIN,

 6             Defendant.

 7   ------------------------------x

 8                                   New York, N.Y.
                                     February 14, 2013
 9                                   10:20 a.m.

10

11   Before:

12            HON. ROBERT P. PATTERSON, JR.,

                                     District Judge
13

14                      APPEARANCES

15

16   PREET BHARARA,
          United States Attorney for the
17        Southern District of New York
     JASON HERNANDEZ
     JOSHUA ARDITI NAFTALIS
18   SARAH Y. LAI
          Assistant United States Attorney
19
     FREDERICK HARVEY COHN
20        Attorney for Defendant

21
     ALSO PRESENT:
22
     EMMA LARSON, USAO Paralegal
23   NAUSHAUN RICHARDS, FBI
     REBECCA VASSILAKOS, FBI
24

25
```

D2ekches                    SENTENCE

1            (In open court)

2            THE DEPUTY CLERK:  United States versus Vadim Chervin.

3    Is the government ready in this matter?

4            MR. HERNANDEZ:  Yes.  Good morning, your Honor.  Jason

5    Hernandez, Josh Naftalis, and Sarah Lai for the United States.

6    With us at counsel's table is also Emma Larson, a paralegal in

7    our office, and Shaun Richards, who is an FBI special agent.

8            THE COURT:  I can hardly hear you for some reason.

9            MR. HERNANDEZ:  I'm sorry, Judge.  I'm a little under

10   the weather and I think the mike is off.  Try it again?

11           THE COURT:  Yes.  That's fine.

12           MR. HERNANDEZ:  All right.

13           THE COURT:  Good morning, Mr. Hernandez, Mr. Naftalis,

14   and Ms. Lai and Ms. Larson and Mr. Richards.

15           MR. COHN:  Good morning, your Honor.  Fred Cohn for

16   Mr. Chervin.  With me is Carina Patritti.  She's awaiting

17   admission here, but she's not admitted and she will not speak

18   on the record.

19           THE COURT:  Good morning, Mr. Cohn and Ms. Patritti,

20   and good morning, Mr. Chervin.

21           Have the parties discussed how they want to proceed

22   this morning?

23           MR. HERNANDEZ:  Judge, I think we have.  The

24   government is going to call three witnesses.  We are going to

25   call Svetlana Chervin first.  That's Vadim Chervin's wife.

D2ekches                        SENTENCE

1    Then we're going to call Agent Richards and then Larisa Chervin

2    last.  I don't think that our directs will be more than more

3    than 45 minutes combined, hopefully less, probably less, and I

4    don't know if Mr. Cohn has any witnesses.  I don't think he

5    does.

6              MR. COHN:  Your Honor, I would not call any additional

7    witnesses, but I do have a couple of exhibits that I will put

8    in through I think probably Ms. Chervin, and we should be done

9    well before noon, in my view.

10             THE COURT:  There are two Ms. Chervins --

11             MR. COHN:  Pardon?

12             THE COURT:  -- aren't there?

13             MR. HERNANDEZ:  There two, that's right.

14             MR. COHN:  Yes, Ms. Chervin the elder.

15             Sorry about that.

16             THE COURT:  I see.

17             MR. HERNANDEZ:  With the Court's permission, we call

18   Svetlana Chervin.

19    SVETLANA CHERVIN,

20        called as a witness by the Government,

21        having been duly sworn, testified as follows:

22             THE DEPUTY CLERK:  If you can pull that chair as far

23   forward as you can, keep your voice up.  The microphone will

24   pick you up.  Please state your name and spell your first and

25   last names slowly for the record, please.

D2ekches                         SENTENCE

1           THE WITNESS:  My name is Svetlana Chervin.  The first

2   name is S-v-e-t-l-a-n-a, the last name is C-h-e-r-v-i-n.

3   DIRECT EXAMINATION

4   BY MR. HERNANDEZ:

5   Q.  Ms. Chervin --

6           THE COURT:  Go ahead.

7   Q.  Ms. Chervin, over here.

8   A.  Yes?  Where?

9   Q.  Hi.

10  A.  Hi.

11  Q.  My name is Jason Hernandez.  I'm an Assistant United States

12  Attorney.  I'm going to be asking you some questions.  I ask

13  that when you respond, you speak clearly into the microphone,

14  OK?

15  A.  I'll try.

16  Q.  Thank you.

17          Ms. Chervin, where do you currently live?

18  A.  I live half a block away from my marital home.  It's 5

19  Blythewood Court, North Brunswick, New Jersey.  The zip code is

20  08902.

21  Q.  Can you describe the home you live in now?

22  A.  It's a nice home that I don't own but I rent, and I rent

23  the apartment there.

24  Q.  Can you tell us how many bedrooms and what the home

25  generally looks like?

D2ekches                          S. Chervin - direct

1    A.  Generally, it looks just like a home in the area, which is

2    a great area, which was built approximately 20 years ago, and

3    it has four bedrooms in it.  And I, my mother, my younger son,

4    Alan, who's 12 years old, and all three of us will live there

5    and occupy three bedrooms and the living room -- well,

6    basically the owners have left their stuff in the home, so

7    wherever they left their stuff, we don't go, OK.

8    Q.  Does Alan have his own bedroom?

9    A.  Yes, he does.  And Alec has his own bedroom, my son my

10   older son, who's 18.

11   Q.  Both of those children you had with Vadim Chervin?

12   A.  Yes, that's his children.  And though his father wanted to

13   check for DNA recently, only a year ago --

14        MR. COHN:  Move to strike.  And I ask that you

15   instruct the witness to answer the questions.

16        THE COURT:  Objection sustained.

17        Just answer the questions that are asked.  Try not to

18   volunteer, Ms. Chervin.  Your lawyer will ask the question if

19   he --

20        THE WITNESS:  My husband had to hear that.

21   Q.  OK, Ms. Chervin, you have to understand that you're only to

22   answer the questions I'm asking you, OK?  Do you understand

23   that?

24   A.  I do.

25   Q.  Can you do that, please.

D2ekches                          S. Chervin - direct

1   A.  I will.

2   Q.  OK.  Thank you very much.

3         Are you employed?

4   A.  Yes.  I am self-employed.

5   Q.  What do you do?

6   A.  I do teachings and healing.

7   Q.  Can you tell us more specifically what it is that you do?

8   A.  Yes.  I do extrasensory medicine, which is basically a

9   clairvoyant understanding of psychological state of mind, plus

10  parapsychological abilities of people, including their extra

11  abilities, that they have not attained yet, and philosophical

12  teachings of Buddha, Christ and other masters.

13  Q.  Do you make any income from this?

14  A.  I do.

15  Q.  What was your income last year?

16        THE COURT:  From when --

17        THE WITNESS:  From that what I do, it was

18  approximately $15,000.

19        MR. HERNANDEZ:  I'm sorry, Judge, did you have a

20  question you wanted to interject or?

21        THE COURT:  I think she may have other income than

22  from just what she does.  That's why I --

23        MR. HERNANDEZ:  I understand, Judge.

24  Q.  Let me ask you the question again, Ms. Chervin.

25        From your teachings, what do you personally make?

D2ekches                         S. Chervin - direct

1    What did you make last year?

2    A.   $15,000.  I just started basically, I went into it full

3    time a year and a half ago.

4    Q.   Do you have any other sources of income?

5    A.   I was unemployed, right after my husband made me so, and

6    after that, I also use my IRA money.  That's practically it.

7    Q.   And you said that you live with your mother as well?

8    A.   Yes.

9    Q.   Does she have any source of income?

10   A.   No, she was on disability.  She had type two diabetes, and

11   she is practically healthy now.

12   Q.   Does she collect Social Security or any other form of --

13   A.   No; she just depends on me.

14   Q.   Ms. Chervin, you have some postings on the Internet site

15   YouTube; are you aware of those?

16   A.   Well, I posted them there.

17   Q.   Bear with me.  Do you know which videos I'm referring to?

18   A.   Those are the videos of the Channel of the Divine Energy,

19   which is consciousness and which is infinitely divine.

20   Q.   OK, Ms. Chervin, we have seen them.  Counsel for the

21   government, Mr. Cohn, the Court has seen them.

22        Can you explain what it is that you're doing in those

23   videos?

24   A.   Well, this is a natural phenomenon that is known throughout

25   the world and people who are able to consciously speak the

D2ekches                        S. Chervin - direct

1     light entities as people know them, they are gathering people

2     for seminars of teachings and they have not themselves but that

3     influence that they are able to milieu to people.  It is not

4     only the ability for others to be more clear in understanding

5     what it is God brings to us and it is not anyhow different from

6     that when you go to church, because practically when you listen

7     to seminars of channeling, you establish your own higher self.

8     It is kind of like when you go to the yoga center, and not just

9     the yoga center where you helping -- instructed in what pose

10    you have to sit, but to the yoga center that actually has a

11    great teacher that would be a medium for your ascension,

12    therefore, will be guiding you to attain your higher self.

13    Q.  Do you know whether people who either believe in or

14    practice this form of channeling believe in this philosophy?

15    A.  I do.  There are a few people that are really famous

16    throughout the world.  They are traveling and having huge

17    seminars.  One of them is Lee Carroll.  He's an American.  The

18    other one is Esther Hicks.  She is an American.  There are

19    other people but these two are known throughout the world, and

20    law of attraction is so knowing, because Esther Hicks, who is

21    channeling Abraham, was the one to bring it to people.

22    Q.  Ms. Chervin, I'm going to ask you about some different

23    topics now.

24           Did there come a time when you left your marital home

25    36 Lake Drive for your current address?

D2ekches                          S. Chervin - direct

1   A.   Could you ask that question again?

2   Q.   Did there come a time when you left 36 Lake, Drive your

3   marital home for --

4   A.   Yes.

5   Q.   You've got to let me finish the question because the court

6   reporter has to write down the full question.

7   A.   I'm sorry.

8   Q.   That's OK, no problem.

9        Did there come a time when you left your marital home,

10  36 Lake Drive, for your current address?

11  A.   Yes.

12  Q.   Why did you leave?

13  A.   Because by that time I was asked by my husband throughout a

14  year prior to I left, every day, to leave the home.

15        THE COURT:  June of last year or June --

16        THE WITNESS:  June of last year I went to live at my

17  neighbor's house, a friend that actually let me stay there.

18  Q.   Before you left, did you tell Vadim Chervin that you were

19  going to leave?

20  A.   Yes.  I told him that it will be destined for us to live

21  separately, and I am not about to go away for another -- a

22  while.  And he was asking me insistently for how long, so I

23  told him for another year.  And every day he was asking me to

24  go away.

25  Q.   And the home that you live in now, is it walking distance

D2ekches                          S. Chervin – direct

1    to 36 Lake Drive?

2    A.   Yes.  It's half a block away.

3    Q.   I'm going to ask you now about your two sons, Alan and

4    Alec.

5             Before you left 36 Lake Drive –– so my questions are

6    about before you left –– what level of involvement did you have

7    in your son's life?

8             MR. COHN:  Object to the form of the question.  If she

9    understands it, she can answer it.

10            THE COURT:  Objection sustained.  Let's keep it to the

11   singular.  It's hard for the Court to understand whether you're

12   talking about a son or both sons.

13            MR. HERNANDEZ:  No problem.  I'll clarify it, Judge.

14   BY MR. HERNANDEZ:

15   Q.   With respect to both of your children, Alan and Alec,

16   before you left 36 Lake Drive, can you describe your level of

17   involvement with each of your sons?

18   A.   Sir, I am a mother; I am infinitely involved in my

19   children's life.

20   Q.   Can you just give us some examples of how you were involved

21   on a daily or weekly basis?

22   A.   Just like a good mother involved in the life of their

23   children, I am awaking up in the morning with the great thought

24   about happiness and joy in my sons' life, not only my sons'

25   life, in the life of every child on the earth, and not only

D2ekches                          S. Chervin - direct

this planet, in the way that this Court has to have the dignity

not to disrespect the mother, I will ask you to please choose

the right questions.

Q.  Ms. Chervin, did you have any involvement in your sons'

schools?

A.  I was the only one who had the involvement in my sons'

schools, and I do now.  And the reason why my son is admitted

to Rutgers Prep earlier than usual children do get admitted to

college, is because I am deeply involved and I was the

influence for him to study the past four years at the better

school for him, for his character, for his realization in life,

because he is shy by life.  And my husband -- I'm sorry, that's

it.

Q.  Did you cook for your children?

A.  Yes; I cook for my children, I cook for my mother and

myself.

Q.  Again, from when you lived at 36 Lake Drive --

A.  Sir, if a woman has a time after work and after her chores

and she has nobody but her mom -- well, if my mom has time to

cook, she does.  If my mom does not have time to cook, then I

cook.  And his mother was always living with her mother -- and

if she got a lot of lies and awfulness against me, it's because

of her fear in life and jealousy.

Q.  Ms. Chervin, I will ask you about Larisa Chervin later, but

I'm going to ask you again to please only answer the question

D2ekches                          S. Chervin - direct

1   that I'm asking you, OK?

2   A.  Yes.

3   Q.  Again, from the time period when you lived in 36 Lake

4   Drive, who was more involved on a day-to-day basis in your

5   sons' lives, you or Vadim Chervin?

6   A.  I am the only discipliner for my children.

7   Q.  What do you mean by that?

8   A.  I mean that psychologically, intelligently, and by nature,

9   I am the parent that is to discipline, to give them best

10  revelational examples, to actually not just ask them things and

11  leave them doing nothing about it, but strong guidance if it's

12  needed.  I have to raise the voice if it's needed, I have to

13  pull by the hand and sit them down and do their homework.  They

14  are boys they have no father next to them for a very long time,

15  as long as my husband felt free doing what he wanted to do in

16  his life.  Therefore, only two years ago, the idea of being

17  closer to his sons got to his head.  I'm sorry about that.

18          THE COURT:  Well, let me ask you a question.

19          Would you take either of the children to school?

20          THE WITNESS:  I -- well, I do take my younger son to

21  the school.  My older son drives his car to the school.

22          THE COURT:  I see.

23          THE WITNESS:  And, yes, I and my mother, we have been

24  always taking them to the bus and from the bus and if needed,

25  when the bus is not there or anything, to the school.  And I am

D2ekches                          S. Chervin - direct

1    knowing -- I am the one to receive all the emails, all the

2    phone calls, all the mail and answer it, and correspond.  And I

3    am the one who brought them to different colleges this year, to

4    show them what he's about to admit.  And I was always the one

5    to keep in contact with his teachers, their teachers for

6    them -- for me they are one son, OK.  So I love them just like

7    mother loves them, and all these accusations are horrible and

8    especially because they talked like that to my children, they

9    were putting lies and these --

10             THE COURT:  I'm not worried about that.  I'm just

11   worried about understanding your daily life.

12             THE WITNESS:  Sure.

13             THE COURT:  What about medical appointments?  Who

14   would take the children to those?

15             THE WITNESS:  Our physician first saw Vadim Chervin

16   probably a year ago.  The rest of the lifetime, I was the one

17   to bring them to the doctors.

18   BY MR. HERNANDEZ:

19   Q.  Ms. Chervin, you have your own beliefs about medicine,

20   don't you?

21   A.  I am not against the medicine.  I am a medicine woman, and

22   I am a holistic medicine woman.  The medicine that you can call

23   like let's say valerian root, which is a plant, the one that

24   you use to calm down your nervous system, this medicine is so

25   much better than the tranquilizers that people usually have

D2ekches                          S. Chervin - direct

1    been taking because they are prescribed by regular doctors.

2    And regular doctors sell you medicine that was promoted to them

3    by drug companies, and, therefore, I do understand which

4    medicine is best for the health of the human.

5    Q.   Ms. Chervin, do you have any objection to taking your

6    children to seeing what we might call a conventional physician,

7    psychiatrist or psychologist?

8    A.   My both children have been under physician evaluation all

9    their times, all their lifetimes.  And all these time -- I'm

10   sorry, I am nervous.

11            THE COURT:  Don't worry about being nervous.

12            THE DEPUTY CLERK:  You want some water?

13            THE WITNESS:  Yes.

14            THE COURT:  Just relax.

15            THE WITNESS:  The only evaluation --

16            MR. HERNANDEZ:  Ms. Chervin, let me give you a more

17   specific question.

18   BY MR. HERNANDEZ:

19   Q.   Do you know whether your two sons are currently seeing any

20   physicians or psychiatrists or phycologists?

21   A.   My son -- sorry, I had to talk a water.

22   Q.   No problem.

23   A.   My son, my younger son, was having seizures, when he was

24   nine years old it started.  No, first time it was when he was

25   two years old.  He had one chronicle seizure and we took him to

D2ekches                         S. Chervin - direct

1   the hospital and I prayed to God that it never happen again.

2   Yet it happened.

3          THE COURT:  What is the name of the doctor that treats

4   him for that?

5          THE WITNESS:  He's healthy now.

6          THE COURT:  I see.  Well, what was the name of the

7   doctor who did treat him?

8          THE WITNESS:  He had two neurologists that were seeing

9   him, one at St. Peter's Hospital and the other one at Staten

10  Island clinic, and I don't remember his name.  But the lady

11  that was treating him in St. Peter's Hospital, she was amazed

12  with the result because within eight months I was able to take

13  him off his medication.  And he was not -- he was on type of

14  medication that would be kind of like Prozac, and that's why I

15  did to take him to psychologist and psychiatrist, and also on

16  tranquilizers for the seizures.  He's off all of these

17  medications.  He's doing -- he will be doing great in school.

18  Yet God made it possible.

19  Q.  Ms. Chervin, thank you for answering the question.  I have

20  another question for you, OK?

21  A.  My husband wasn't there --

22  Q.  Ms. Chervin, there was not a question posed, OK?  I

23  understand.  Just take a moment, please, to listen to the

24  question.

25          If Vadim Chervin is not able to take your sons to meet

D2ekches                          S. Chervin - direct

1   their physicians or psychiatrists or phycologists, will you

2   take them?

3   A.  I do not think that this question is eligible because this

4   Court basically is not responsible for getting into my marital

5   issues, because the issue of this Court is have been Vadim

6   Chervin doing a legal proper work with his business, and I can

7   tell you, yes, he did.  And the rest of my marriage does not

8   have anything to do with that what is going on in this

9   courtroom.

10  Q.  Ms. Chervin, do you understand that we're here for a

11  sentencing proceeding?

12  A.  Could you repeat that?

13  Q.  Do you understand that we are here for a sentencing

14  proceeding?

15  A.  Yes.  And what is the sentencing?

16  Q.  Do you understand that the judge --

17          THE COURT:  For your husband --

18          THE WITNESS:  What is he charged of?

19  Q.  Hold on, Ms. Chervin.  Just answer my questions if you

20  could.  If you don't understand it, let me know.  But do you

21  understand that one of the reasons that we are here today is

22  that the judge may sentence Vadim Chervin to a term in prison?

23  Do you understand that?

24  A.  My husband does not deserve prison.

25  Q.  My question was, though, whether you understand that that

D2ekches                    S. Chervin – direct

1    is a possibility today.

2    A.  I don't want to take it as possibility.

3    Q.  OK, I understand you don't want to accept that, but do you

4    nonetheless acknowledge that that is one of the things that

5    could happen here today?

6    A.  I'm sorry, I answered your question.

7            THE COURT:  Well, let me just tell you that the issue

8    before the Court is how long your husband should go to prison.

9            THE WITNESS:  I'm sorry?

10           THE COURT:  The big issue before the Court is how long

11   your husband should go to prison for.

12           THE WITNESS:  He shouldn't.

13           THE COURT:  Then it's possible that he not go to

14   prison, and that is an alternative, but the real issue is

15   whether I should follow the guidelines, which call for a

16   sentence of -- what is it, 53 months?

17           MR. HERNANDEZ:  At least that much, Judge, yes.  It

18   depends on how you come out on the --

19           THE COURT:  At least 53 months in prison.

20           THE WITNESS:  For what?

21           THE COURT:  For conspiracy to defraud people.

22           THE WITNESS:  My husband did not defrauded people.  He

23   was simply collecting bills for medical providers.

24           THE COURT:  I understand.

25   BY MR. HERNANDEZ:

D2ekches                         S. Chervin - direct

1    Q.  Ms. Chervin, you don't think your husband is guilty; is

2    that right?

3    A.  I know that he is not.

4           THE COURT:  The question is whether the bills were

5    fraudulent.

6           THE WITNESS:  My husband had no awareness of any bills

7    being fraudulent, and he is not the one to be responsible for

8    that.

9    BY MR. HERNANDEZ:

10   Q.  Ms. Chervin, do you want your children -- are you looking

11   for something, Ms. Chervin?

12   A.  I was -- I'm sorry, your voice sounds from over there.  So

13   I was thinking maybe I'm answering somebody else's questions.

14   Q.  No, right here.

15   A.  OK.

16   Q.  I'll start again.

17          Ms. Chervin, is it fair to say that you don't want

18   your husband to go to prison?

19   A.  I just told you so.  I never wanted, I was always

20   supportive of my husband.  I feel that my husband is a son to

21   me.  He is not guilty, and he is not going to prison.

22   Q.  Will you assume for a moment, for this question, that

23   there's a possibility he will go to prison?  Can you do that

24   for me?

25   A.  I believe you asked me that question before.

D2ekches                          S. Chervin - direct

1   Q.  OK, good.  Then I'll ask it a different way.

2              If Vadim Chervin goes to prison, do you want your sons

3   to continue to have a relationship with him?

4   A.  My husband will stay with my children because my children

5   love him dearly.  They wouldn't want their father to go to

6   prison and he never deserved to go to prison.

7   Q.  Understood.  My question is about you.  Do you want your

8   sons to continue to have a relationship with their father,

9   Vadim Chervin, if Mr. Chervin is sent to prison?

10  A.  This is a godly matter --

11             THE COURT:  Objection to the form of the question.

12             THE WITNESS:  Thank you so much, Judge.

13  Q.  If Vadim Chervin is sentenced to prison, are you going to

14  take your sons to see him in prison?

15  A.  I will take my sons to see their father in any matter -- in

16  everywhere, in any situation.

17  Q.  Ms. Chervin, you testified before that you discipline your

18  children, correct?

19  A.  I do.

20  Q.  In your mind, is there a difference between disciplining

21  your children and physically abusing your children?

22             MR. COHN:  Object to the form; calls for a legal

23  conclusion.

24             THE COURT:  Objection sustained.

25             MR. HERNANDEZ:  Judge, the question is phrased that

D2ekches                       S. Chervin - direct

1    way because --

2              THE COURT:  I know why it is.

3              MR. HERNANDEZ:  OK.

4              MR. COHN:  Your Honor, I don't want to interfere.

5    It's a fair question if we can get to it.  If he wants to talk

6    about corporal punishment as discipline, that's another issue,

7    and maybe it would be clearer.

8              MR. HERNANDEZ:  I'm not sure that using the phrase

9    "corporal punishment" makes it any clearer, but I'll just ask

10   my questions and we'll see what happens.

11   BY MR. HERNANDEZ:

12   Q.  Ms. Chervin, do you discipline your children?

13   A.  I do.

14   Q.  Does that ever include any physical touching of the

15   children?

16   A.  I touch my children all the time, and I touch them in a

17   matter that God lets me.

18   Q.  Have you ever, in your mind, physically abused your

19   children?

20   A.  I can say that when I was in disturbed state of mind, not

21   willingly, I could have hurt them but not the way that it would

22   be an abuse.

23   Q.  You said you could have hurt them?

24   A.  Yes.

25   Q.  The question is whether you actually have.

D2ekches                         S. Chervin - direct

1    A.   Sir, are you sentencing me?

2    Q.   Have you abused your children?

3    A.   I am sorry, but I just answered your question.

4    Q.   Is the answer to my question no?

5    A.   No.

6              MR. COHN:  Objection.

7    A.   The answer to your question is no.  I do not abuse

8    children.

9    Q.   Let me ask you some questions about Larisa Chervin.  Do you

10   know who that is?

11   A.   Yes, I do.

12   Q.   Who is she?

13   A.   She is the lady who wants to be a better mother.

14   Q.   Have you ever physically assaulted Larisa Chervin?

15   A.   No, I have not.

16   Q.   Have you ever hit her with a shoe in the mouth?

17   A.   No, I have not.

18             MR. HERNANDEZ:  No further questions.

19             MR. COHN:  May I, your Honor?

20             THE COURT:  Yes.

21   CROSS-EXAMINATION

22   BY MR. COHN:

23   Q.   Ms. Chervin, what training have you received to support

24   your holistic healing?

25   A.   I am a student of metaphysical science, University of

D2ekches                        S. Chervin - cross

1   Sedona.

2   Q.  Did you attend school there?

3   A.  I do my study online and they send me my teaching

4   materials, and I am about to write my doctor's right after this

5   criminals court, because this will give me a lot of more

6   understanding of how human mind works.

7   Q.  Are you licensed to treat people medically in any way?

8   A.  I don't treat them medically in the way that I prescribe a

9   Paxil medicine.  That is unhuman in these amounts to people.  A

10  lot of people taking drugs all their lives and suffer because

11  of that.

12  Q.  Do you treat people who have physical illnesses like

13  cancer?

14  A.  I am there to support them, give them emotional relief,

15  influence them with the highest vibrational light of their own

16  god.

17  Q.  And do you give them whatever medications, natural

18  medications, it is that you prescribe?

19  A.  No.

20  Q.  You don't?

21  A.  No.

22  Q.  Have any of your patients died while you were treating

23  them?  I don't mean in your office.  I mean during the period

24  in which you were treating them.

25  A.  My patients are humans.  And the way that you asked the

D2ekches                     S. Chervin - cross

1    question, if a priest goes to a person who wants his help and a

2    priest spends the last hours at the bed of a dying human, would

3    you ask him a question like that?

4    Q.  I don't know, ma'am.  I ask the questions; I don't answer

5    them.

6              Didn't in fact one of your patients die yesterday?

7    A.  She is a dear friend, she is a mother of two children, she

8    is a wonderful person --

9    Q.  Ma'am, did she die yesterday?

10   A.  I attend her funeral yesterday, and I will ask you to

11   respect that.

12   Q.  You can ask what you like, ma'am.  Did she die yesterday?

13   A.  She had a cancer.

14   Q.  Did she die yesterday?

15   A.  I did say I attend her funeral.

16   Q.  And she was a patient of yours as well as a dear friend,

17   right?

18   A.  She had her own doctors and she was going to a lot of

19   treatments.

20   Q.  How often did you see her as a patient?

21   A.  I saw her three times throughout the last two years.

22   Q.  Did you charge her money?

23   A.  No.

24   Q.  You did not?

25             You do charge money to your patients, however, do you

D2ekches                        S. Chervin - cross

1    not?

2    A.   Some do, some not.

3    Q.   You were on unemployment insurance, is that right, for some

4    period of time?

5    A.   That's correct.

6    Q.   When did you terminate your unemployment insurance?

7            THE COURT:  I don't see the relevance.

8            THE WITNESS:  Thank you, Judge.

9    Q.   What medications -- I'm sorry, I shouldn't walk away from

10   this.

11           Do you know what medications your children are

12   currently taking?

13   A.   My younger son does not take medication, and he refuses to

14   take aspirin when I give it to him.  When he has some

15   congestional problems, he will involve it.  My older son, he

16   stays at the apartment where my mom used to stay, at what my

17   husband's mother called her mansion, which is still my marital

18   home where my children are growing, I shall say, at least one

19   of them.

20           No, the 18-year-old is old enough to teach his father

21   because he's more intelligent, and he's not abusive to his own

22   psychic mind.  And my 18-year-old stays at that apartment where

23   there's a kitchen missing.  And he takes his own car to his

24   school, and he has a bright future as long as his father is

25   agreeing to pay for his education.

D2ekches                        S. Chervin - cross

1          And he is responsible enough for my husband's mother,

2    who's scared for her life because she never has been living her

3    life without the man next to her, and all of a sudden two of

4    her man again being brought to court.  So she was viciously

5    going against me to make sure that everything is done,

6    everything, even the lowest low, is done.  So she was lying a

7    lot and disturbing my children.

8    Q.  So I take it from the way you answered that question that

9    the short answer is, no, you have no idea what medications

10   they're taking?

11   A.  My older son, when he feels that he has an allergy and he's

12   going through that what we call change, and he is -- and I am

13   not going to get into that.  If he is taking a medication that

14   is over-the-counter medication.

15   Q.  So you don't know if in fact it's true that he is --

16   A.  If somebody else tells you that they are sick, then these

17   people are not of God.

18   Q.  Ma'am, if you'll wait for my question, then you can do

19   whatever it is you like to do, which apparently you will do

20   anyway.

21          Now, are you aware that your older son is currently on

22   major antidepressants?

23   A.  Who put him on those?

24   Q.  Are you aware of that, ma'am?  Yes or no.

25   A.  My son was not on antidepressants.  Who and when put him on

D2ekches                          S. Chervin - cross

1   this medication?

2   Q.   When was the last time you took either of these children to

3   a doctor?

4   A.   Every year I take our children to see a doctor.  And the

5   last time I know my husband, against my will, brought them to

6   Manhattan doctor, with whom I speak right after he took them

7   there, and the doctor told me that both of my children were

8   fine, the older one was a bit suppressed with him.  He took a

9   gene after myself.  For most of my life I was suppressing my

10  own intelligence --

11          THE COURT:  Who was this doctor?

12          THE WITNESS:  I have his name stored in my phone as

13  well as other names of people that my husband has been

14  contacting in order to make this Court believe that I am a bad

15  woman.

16          THE COURT:  Well, what is the name of the person?

17          THE WITNESS:  Sir, I don't remember.  It was sometime

18  before -- no, after my husband sent me divorce papers and I did

19  store the name of the doctor in my phone and I called him and I

20  spoke with him.  And he saw my children two times.  And after

21  our conversation, he felt better.

22          THE COURT:  Is that last fall?

23          THE WITNESS:  Yeah, the past fall.

24  Q.   Were you contacted by a doctor by the name of Dr. Spitz?

25  A.   Who is that man?

D2ekches                              S. Chervin - cross

1              THE COURT:  How do you spell that?

2              MR. COHN:  S-p-i-t-z, Spitz.

3              THE WITNESS:  The doctors that I've been talking to, I

4    was contacting.  I demanded my husband to give me the doctors

5    and the names, and I have contacted the doctors.

6              THE COURT:  Did any doctor call you?

7              THE WITNESS:  No.  Can I ask what's going -- I am so

8    sorry.  Right now I need to ask a question:  What's going on

9    with my older son?  What did these people do to my older son?

10             THE COURT:  That's what we're trying to find out.

11   BY MR. COHN:

12   Q.  Did Dr. Spitz call you and ask you to come and be

13   interviewed in regard to his evaluation of your children?

14   A.  I don't know who Dr. Spitz is.  Who is Dr. Spitz?

15             THE COURT:  Did someone call -- I'm sorry, Mr. Cohn.

16             Did a secretary or someone call you and ask you to

17   talk to Dr. Spitz?

18             THE WITNESS:  Who's secretary?

19             THE COURT:  Well, a telephone operator?  Did someone

20   call you on the telephone?

21             THE WITNESS:  Judge, maybe they called the wrong

22   number.  I didn't have anybody calling me regarding my

23   children.

24             THE COURT:  All right, I just thought maybe a woman --

25             THE WITNESS:  I need to know what's going on with my

D2ekches                    S. Chervin - cross

1   son.  What is going on with my son?  And how long is he taking

2   antidepressants?

3           THE COURT:  We're trying to find out facts.  We're

4   trying to find out what happened.  It doesn't mean anything.

5   You've just --

6           THE WITNESS:  It does mean to me that my son's life

7   has been jeopardized.

8           Vadim, why does Alec take antidepressants?

9           THE DEFENDANT:  Because he asked for it.

10          THE WITNESS:  He asked for antidepressants?

11          MR. COHN:  Why don't you be quiet, Mr. Chervin.

12          THE WITNESS:  Why did he ask for antidepressants?

13          MR. COHN:  Your Honor, perhaps you could instruct the

14   witness that it's not a colloquy, and she's not to answer

15   questions.

16          THE COURT:  The lawyers don't know.  The person asking

17   the question is a lawyer.  He doesn't know.  He's asking

18   questions merely to find out the facts, and we're trying to

19   find out what --

20          THE WITNESS:  Who is Mr. Spitz?

21          THE COURT:  Again, it's not Mister, it's allegedly

22   Doctor.

23   BY MR. COHN:

24   Q.  Did you ever talk to a person, a therapist, by the name of

25   Andrey Rusetskiy?

D2ekches                          S. Chervin - cross

1    A.  I believe that this is the psychologist with whom I spoke

2    past fall.

3    Q.  Did you ever visit him and be interviewed by him in regard

4    to the treatment of your children?

5    A.  No.  As soon as I found out what his name was, I called

6    him, I left him a message, he called me back.

7    Q.  So you didn't see him?

8    A.  I didn't see him.  He is a really nice gentleman, who had

9    tons of the support, and he said that my children are healthy.

10   Q.  Did you threaten him?

11   A.  Who?

12   Q.  Mr. Rusetskiy?

13   A.  Never.

14   Q.  And you say he said that your children are happy and well;

15   is that right?

16   A.  I did talk about it previously.  What is this accusations?

17   Am I under arrest?  Am I in need of a lawyer?  What are these

18   questions from different people in this courtroom?  What court

19   is this?  This is for sentencing.  And why is my child taking

20   antidepressants?

21            MR. COHN:  Your Honor, perhaps you should call the CJA

22   office.

23            THE WITNESS:  I will not answer any more questions.

24            MR. COHN:  Well, that works for me.

25            Perhaps you should call the CJA office and get her a

D2ekches                         S. Chervin - cross

1    lawyer.

2              THE COURT:  I don't see any need.

3              MR. COHN:  Well, she's not answering any more

4    questions, and I have more questions to ask.

5              THE COURT:  I don't know she meant that.  You've

6    gotten on a subject that is sensitive.

7              MR. HERNANDEZ:  Judge, it may be helpful if there is a

8    clarification.  Ms. Chervin just asked if she's under arrest.

9    Obviously she is not.  She's not being investigated for

10   anything by the U.S. Attorney's Office.  There's no suggestion

11   that there is anything criminal going on.  And maybe your Honor

12   can once again try to explain to Ms. Chervin why these types of

13   questions are being asked in this proceeding so that she has a

14   better understanding of why we're asking these questions about

15   her family.

16             THE COURT:  All right.  I will explain.

17             What we're trying to find out is whether -- I don't

18   know to put this.  I don't have any intention of making a

19   determination of who should be the custodial guardian of the

20   children.  That's a matter for the New Jersey courts, not for

21   me.  I have no intention of making that determination.

22             MR. COHN:  Well, may we excuse the witness while you

23   and I talk about that, your Honor?  Because I think that

24   your --

25             THE COURT:  I'm not going to make a determination of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D2ekches                         S. Chervin - cross

1   something that is within their jurisdiction, not mine.  I

2   will --

3           MR. COHN:  May I be heard on that, your Honor?

4           THE COURT:  There seems to be a dispute between

5   counsel as to whether you are a fit mother for the children.

6           THE WITNESS:  This is not my marital court.

7           THE COURT:  I know.  That's their dispute.  They want

8   to argue about that.

9           THE WITNESS:  Let them argue.

10          THE COURT:  Well, in order to argue, they have to have

11  the facts as to --

12          THE WITNESS:  I am not supposed to give them my

13  private life for them to argue without any sense.

14          THE COURT:  Then the question is whether your

15  mother-in-law should be the person who is the custodial --

16          THE WITNESS:  My mother-in-law is afraid to be on her

17  own.  She is not able to take care of children.  She is taking

18  a lot of medications, she is not a good worker in life, she has

19  been always with her husband, helping him around.  She stays

20  home most of the week, she lies and blames, and she is ugly.

21          MR. HERNANDEZ:  Judge, it seems like Ms. Chervin is

22  maybe willing to answer a few more questions.  Can we maybe try

23  again for Mr. Cohn to ask questions?

24          MR. COHN:  I'll be delighted.  I'll try and cut this a

25  little shorter.

D2ekches                        S. Chervin - cross

1    BY MR. COHN:

2    Q.  Ms. Chervin, you said that you never abused your children;

3    is that right?  That's what you said?

4              THE WITNESS:  Judge, this is abuse in the courtroom.

5              THE COURT:  Physically?  I don't think we need -- we

6    heard that.

7              MR. COHN:  Physically.

8              Your Honor, I would like to play what -- I had a label

9    on it, it's Exhibit A.  The government has seen this.  And I

10   believe you have a copy of this.  May I play it for the

11   witness?

12             THE COURT:  Yes, you may.  Where will it be shown?

13             THE DEPUTY CLERK:  It's audio.

14             MR. COHN:  The government has reduced it to a disk so

15   that I'll play their version of it, which is --

16             MR. HERNANDEZ:  The same version.

17             THE COURT:  Can this lady see what you are going to

18   play?

19             MR. COHN:  Yes.

20             THE WITNESS:  Is this a video?

21             MR. HERNANDEZ:  It's audio.

22   BY MR. COHN:

23   Q.  I'd like you to listen to this and tell me if you can

24   identify the voices on it and then if you agree with what

25   they're saying.  But just listen to the tape first.

1          THE COURT:  Maybe I haven't seen this.

2          MR. HERNANDEZ:  Judge, this is an audio, it's not

3    video.  I believe it was submitted by Mr. Cohn --

4          THE COURT:  What I saw was just something that had

5    this witness --

6          MR. COHN:  There is an audio recording of a telephone

7    conversation.  We gave it to the government some time ago, and

8    I thought we had given it to you but perhaps we did not.

9          THE COURT:  I haven't seen it.

10          MR. COHN:  So with the Court's permission now, you'll

11    hear it.

12          THE COURT:  I'll listen to it.  But what question are

13    you going to -- are you going to ask the witness --

14          MR. COHN:  I've asked the witness whether she ever

15    physically abused the children.  She said no.  Now I want to

16    play the tape and see if she still denies it.

17          THE COURT:  All right.

18          (Audio playback)

19          THE WITNESS:  How long have you been trying to make my

20    son try to talk like that?  Is this assist -- he wants you to

21    hear that, what you want to hear, because he doesn't want you

22    to go to jail.

23          And how often are you going to threaten your sons with

24    you going to jail so they can tell that, what you need to say?

25    Because your mother told them that your mother will not go to

D2ekches                        S. Chervin - cross

1   jail anyhow, but your father will if you're not going to say

2   that.  You're dirty play.

3   BY MR. COHN:

4   Q.  Ms. Chervin, do you recognize the voices on that tape?

5   A.  Mostly of my husband making sure that my son lies so he

6   will not go to jail.

7   Q.  So you still deny physically striking your children at any

8   time; is that right?

9   A.  I can --

10  Q.  It's a pack of lies?

11  A.  I can tell you that pack of lies has come from Vadim's

12  mother and Vadim himself, because they try to blame me and

13  everything what was in their lives because that will make it

14  more convenient, because grownup people in the courtroom will

15  try to spend half a day making sure that an issue that doesn't

16  have anything to do with this court will be presented in a way

17  that my husband has to stay home and supervise my children.  I

18  can assure you Vadim is not guilty in his business, yet he is

19  guilty in bringing that into the lives of my children.

20  Q.  The boy who was on the --

21  A.  And in that I will be talking to the charge on the 26th of

22  this month.

23  Q.  We'll get to that.

24          THE WITNESS:  Can I have more water, please?

25          Thank you so much, sir.  Thank you.

D2ekches                          S. Chervin - cross

1              THE DEPUTY CLERK:  You're welcome.

2              THE WITNESS:  I am not afraid.  I have not deserved

3    any punishment.  And my sons's psychological mind is alert only

4    because I am a natural healer.  These people are disgrace, and

5    this is the major reason why I am divorcing right now.  And my

6    husband was the one to start all of that, and my husband is

7    still does not understand how he betrayed his family, his

8    children.

9    Q.  On that audiotape, the boy was how old at the time that was

10   made, 11?

11   A.  When did you make this tape?

12             THE COURT:  Which boy is it?

13             THE WITNESS:  That is my younger son, who goes to

14   visit his father every weekend.  And I believe this was made

15   recently.

16             And I am asking you, when did you make this tape?

17   When did you hit him?  When did you make this tape?

18             THE COURT:  I think that will come out later.

19             THE WITNESS:  I will ask my son.

20   Q.  I'm sure you will.  And you should keep your hands off him

21   when you do.

22             MR. HERNANDEZ:  Objection.

23             THE COURT:  Objection sustained.

24             THE WITNESS:  Thank you.

25             THE COURT:  No need for that.

D2ekches                           S. Chervin - cross

1          THE WITNESS:  You don't have to --

2          THE COURT:  There's no need for that, Mr. Cohn.

3          THE WITNESS:  You don't have to hesitate in respecting

4     me, because I am supporting my children's father, but the way

5     that he is disgrace to his children, it is not of this court

6     matter.  And don't push it there.

7          THE COURT:  There was no need for that, Mr. Cohn.

8     Really.  Let's not have any more of that.

9          MR. COHN:  I apologize to the Court.

10         THE WITNESS:  Apologies taken.

11         MR. COHN:  You are not the Court.

12         THE WITNESS:  I am the one who you disrespect.

13    BY MR. COHN:

14    Q.  Are you aware that since you left the marital home, the

15    younger boy is doing poorly in school?

16    A.  Are you aware that this child has had seizure conditions

17    and had OCD?  And are you aware that when children have these

18    type of condition and they are taken to a regular doctor, they

19    stay on tranquilizers till the rest of their life?  The way

20    that my child has healed and getting much more grade in

21    school -- do not go there.  Prohibited.

22         MR. COHN:  May I approach the witness, your Honor?

23         THE COURT:  Yes, you may.  Let us know what you're

24    showing her.

25         MR. COHN:  Pardon?

D2ekches                          S. Chervin - cross

 1              THE COURT:  Just mark --

 2              MR. COHN:  It's marked as Exhibit C, your Honor, and

 3      the government has seen it.

 4              It's marked as Exhibit C, and the government has seen

 5      it.

 6              THE COURT:  All right.

 7      BY MR. COHN:

 8      Q.  Let me show you what's been marked as Exhibit C.  Take a

 9      look at it, read it.

10      A.  I don't want to.  I don't want to.

11      Q.  You don't want to?

12      A.  No.

13              THE COURT:  Well, then let me read it.  Let me see it.

14      I don't know what it is.

15              THE WITNESS:  Another lie.

16              MR. HERNANDEZ:  Judge, when you're done reading it, I

17      may have an objection.

18              THE COURT:  Could I just ask you if you ever received

19      this letter?

20              THE WITNESS:  Just by looking at the name of the

21      sender of this email, I understand that this email was read by

22      the gentleman over there -- his name is Shaun -- and he read it

23      to me when he have come to my home.

24              THE COURT:  But you never received it in the Gmail?

25              THE WITNESS:  No.

 1              THE COURT:  All right.

 2              THE WITNESS:  And I would like to know:  Who's the

 3    doctor by the name Smith or Siff or anyhow and why my child is

 4    under medication?

 5              THE COURT:  Just answer my question.  You never

 6    received it; is that right?

 7              THE WITNESS:  That's correct.  I don't have it.  I

 8    will keep it to myself.

 9              THE COURT:  The gentleman referred as showing it to

10    you is the gentleman sitting at the end of the table there?

11              MR. COHN:  Your Honor, that's a mistake.  He showed

12    her another Gmail, never that.

13              MR. HERNANDEZ:  That's correct.

14              THE WITNESS:  Oh, so she has been lying a lot.

15              MR. HERNANDEZ:  Ms. Chervin, could you not destroy

16    that exhibit.  It's a court exhibit.  Could you stop folding

17    it.

18              THE WITNESS:  I'm sorry, I thought I could have it

19    since it's addressed to my attention.

20              THE COURT:  Is it?

21              THE WITNESS:  I don't know.  Is it?  Or it's dirty

22    lies behind my back.

23              THE COURT:  Let me see it.

24              THE WITNESS:  Well, it has not been sent to my email.

25    Let this lady blame.  She will come and cry to believe her, and

D2ekches                           S. Chervin - cross

1    she will tell you how that -- a mother of her grandchildren is.

2    And why -- let me ask you a question -- why would she do that

3    in this courtroom?

4            MR. COHN:  Your Honor, since the next question I would

5    have asked was if she had read it, was did you ever receive it,

6    you've asked that question, and I have nothing further about

7    that document, which I think is largely irrelevant to this

8    proceeding, although hearsay is admissible in this proceeding,

9    but I'm not offering it for that purpose.

10   BY MR. COHN:

11   Q.  You said there's a hearing on the 26th.  Is that a divorce

12   proceeding?

13   A.  Yes.

14   Q.  And who is your lawyer?

15   A.  I am.

16   Q.  You had a lawyer, did you not?

17   A.  When Vadim's lawyer have sent to my advocacy a respond two

18   days prior to the courtroom, my lawyer did not send me that

19   respond, did not fax it to me, did not email to me, did not

20   contact me, did not let me know what's in it.  He gave it to me

21   right in front of the courtroom.  And I was reading it while he

22   and Vadim's lawyer went into the court without telling me that

23   they are about to see the judge.  So basically, I saw them

24   after they left the courtroom while I was still reading the

25   response to my mail.  And the way that I asked my lawyer, how

D2ekches                         S. Chervin - cross

1    come you did that, I did not receive any clear answer.

2              So I did not ask him to leave.  He understood himself

3    that he has to resign.

4    Q.  So the answer is you had a lawyer but you do not now have a

5    lawyer?

6    A.  I appreciate his help because I don't know how to contact

7    the courtroom, how to -- I am not advanced in any of these, yet

8    with God's help, I am not guilty and I am here to speak for

9    myself.

10             MR. COHN:  Your Honor, the lawyer's motion to withdraw

11   is before the Court.  It's been submitted by me as part of the

12   sentencing package and by the government as part of their

13   memorandum of two days ago.

14             THE WITNESS:  Did they pay this lawyer to send that to

15   him?

16             MR. COHN:  I have no further questions, your Honor.

17             THE COURT:  All right.  Thank you.  Any redirect?

18             MR. HERNANDEZ:  I have just a couple questions.  I can

19   ask them from here, Judge.  Is that all right?

20             THE COURT:  That's all right.  Maybe you're blocking

21   Mr. Cohn's view.

22             MR. HERNANDEZ:  It's not a pretty view, to look at my

23   backside, so I'll stand over here.

24

25

D2ekches                    S. Chervin - cross

1    REDIRECT EXAMINATION

2    BY MR. HERNANDEZ:

3    Q.  Ms. Chervin, you said you got rid of your lawyer in the

4    divorce proceeding; is that right?

5    A.  I don't say that.  The person has resigned.

6    Q.  He's resigned?  Were you happy with his performance?

7    A.  I was not, and he understood that.

8             MR. HERNANDEZ:  No further questions.

9             MR. COHN:  I have no recross, your Honor.

10            THE COURT:  All right.  Then you're excused.  And

11   thank you.

12            THE WITNESS:  Thank you.

13            THE COURT:  Next witness.

14            MR. HERNANDEZ:  Judge, we are not going to call

15   Special Agent Richards.  We don't think that it's necessary.

16   And we are not going to call Larisa Chervin either, although

17   obviously, if Mr. Cohn may want to call her, we'll

18   cross-examine her.

19            MR. COHN:  I don't think that amounted to prescience,

20   but I do want to call her.  So if the government is resting, I

21   call Larisa Chervin.

22            THE COURT:  All right.  Larisa Chervin, is she here?

23            MR. COHN:  She's here.  She went outside.  Her lawyer

24   is going to get her.

25

D2ekches                          S. Chervin - redirect

1    LARISA CHERVIN,

2          called as a witness by the Defendant,

3          having been duly sworn, testified as follows:

4              THE DEPUTY CLERK:  Please state your name and spell

5    your first and last name slowly for the record, please.

6              THE WITNESS:  Larisa Chervin, L-a-r-i-s-a

7    C-h-e-r-v-i-n.

8    DIRECT EXAMINATION

9    BY MR. COHN:

10   Q.  Ms. Chervin, you had a problem with the oath because what

11   you did was you nodded your head instead of speaking.  Let me

12   remind you that you have to speak your answers because that's

13   the only way the court reporter gets them and the only way that

14   the judge hears them, OK?  So just remember that.  Don't nod,

15   don't shake your head --

16   A.  OK.

17   Q.  -- answer and speak into the microphone.  If you have any

18   difficulty, you'll let us know?

19   A.  OK.

20   Q.  What, if any, is your relationship to Vadim Chervin?

21   A.  I am his mother.

22   Q.  How old are you?

23   A.  64.

24   Q.  Are you married?

25   A.  Yes.

D2ekches                          L. Chervin - direct

1    Q.  To whom are you married?

2    A.  Aron Chervin.

3    Q.  Is Aron Chervin -- withdrawn.

4         You know the purpose of this hearing?

5    A.  Yes.

6    Q.  And what is that?

7    A.  To tell the truth about the family matter.

8    Q.  Who is Svetlana Chervin?

9    A.  My daughter-in-law.

10   Q.  Where does she live?

11   A.  5 Blythewood Court, North Brunswick, New Jersey 08902.

12   Q.  Let me get one thing out of the way quickly.  You have

13   heard an audiotape or an audio -- it's not a tape anymore -- of

14   a telephone conversation between your younger grandchild and

15   Vadim; is that right?

16   A.  Yes.

17   Q.  Were you present when that telephone call was received?

18   A.  Yes.

19   Q.  Having heard it, is it a fair and accurate rendition of the

20   conversation as you heard it?

21   A.  Yes.

22   Q.  Now, how is your health?

23   A.  Poor.

24   Q.  Can you tell us what's the matter with you?

25   A.  I have a high blood pressure, I have asthma, coronary

D2ekches                          L. Chervin - direct

1   disease, high blood pressure, anxiety.

2          MR. COHN:  May I approach the witness, your Honor?

3          THE COURT:  Yes.

4   Q.  Let me show you what we have marked as Exhibit B for

5   identification, and ask you what it is.

6   A.  It's my medication.

7   Q.  It's a clear plastic bag with a lot of medication bottles

8   in it; is that right?

9   A.  That's correct.

10         MR. COHN:  Your Honor, I'm going to offer this just

11  for the purposes of the health of the witness.  And if the

12  Court likes, I will read off the medications, although there

13  are a lot of them.

14         THE COURT:  All right.

15         MR. COHN:  You want me to read them off?

16         THE COURT:  Sure.

17         MR. COHN:  OK.  Then I'm going to open it and get my

18  glasses.

19         THE COURT:  These are your medications; is that right?

20  The witness' medications?

21         MR. COHN:  Yes, it's her medication.  That's what she

22  testified.

23         And I need my glasses.  You can't find your glasses

24  unless you've got your glasses.

25         Your Honor, there is a box here with the title

D2ekches                    L. Chervin - direct

1    "Ventolin," V-e-n-t-o-l-i-n, HFA, which is an Albuterol sulfate

2    and inhalation aerosol.

3                THE COURT:  What is that for?

4                MR. COHN:  I believe it's for asthma.  I don't mean to

5    testify as an expert but --

6                THE COURT:  She knows what it's for.

7                THE WITNESS:  Yeah, it's a shortness of breath.  It's

8    asthma.

9                MR. COHN:  There is hydrochlorot, 25 milligrams tab

10   take one a day.

11               THE WITNESS:  It's a water pills.

12   Q.  I'm sorry?

13   A.  Water pills.

14   Q.  You have a water retention problem?

15   A.  Yes, I have.

16   Q.  Something called Coreg-CR, which is carvedilol phosphate.

17   What is that for?

18   A.  Control level of the blood pressure.

19               MR. HERNANDEZ:  Your Honor, we'd be happy to stipulate

20   that Ms. Chervin suffers from the ailments she identified and

21   that she takes medication for all of them.  I don't know if

22   there's some special reason or inference to be drawn from these

23   long names --

24               MR. COHN:  Nothing.  I'm just trying to complete the

25   record.  It's not necessary, as far as I'm concerned, unless

D2ekches                        L. Chervin - direct

 1    the Court feels it's more comfortable doing it.

 2              THE COURT:  I think the illnesses -- I don't know what

 3    the illnesses are.

 4              MR. HERNANDEZ:  I think Ms. Chervin told us that she

 5    suffers from high blood pressure and a number of other things.

 6              THE COURT:  The other things --

 7              MR. HERNANDEZ:  I can also offer as an alternative:

 8    We got medical records from Ms. Chervin via subpoena.  We have

 9    them marked as an exhibit.  They could be offered and put into

10    the record.  We have medical records and prescriptions.

11              MR. COHN:  I have no problem with that, your Honor.

12              THE COURT:  All right.  Why don't you do that.

13              MR. COHN:  Your Honor, this has been marked as

14    Government Exhibit 3 for identification.  And I have no problem

15    keeping the government's ID on it just for convenience sake,

16    and so we offer it.

17              Your Honor, these were received by subpoena from

18    Mr. Stein, and I don't believe the witness has to identify

19    them.

20              MR. HERNANDEZ:  We have no objection to the admission

21    of the exhibit.

22              MR. COHN:  So we offer them, your Honor.

23              THE COURT:  This is Government Exhibit?

24              MR. COHN:  Government 3.

25              THE COURT:  Government 3 is admitted in evidence.

D2ekches                        L. Chervin – direct

1          (Government's Exhibit 3 received in evidence)

2    BY MR. COHN:

3    Q.  Now, Ms. Chervin, can you describe your current

4    relationship with your daughter-in-law?

5    A.  It's no relationship.

6    Q.  Well, do you have any conversations with her?

7    A.  Lately not.

8    Q.  By the way, have you ever taken your grandchildren to

9    doctors?

10   A.  Yes.

11   Q.  When was the most recent time?

12   A.  Last week.

13   Q.  Which child did you take to the doctor?

14   A.  Psychologist.

15   Q.  I'm sorry?

16   A.  Psychologist.

17          THE COURT:  Which child did you take to the doctor?

18          THE WITNESS:  I'm sorry.  The oldest one, Alec.

19   Q.  Do you recall who the doctor was or what kind of doctor it

20   was?

21   A.  Dr. Shapiro.

22   Q.  And what kind of physician is Dr. Shapiro?  What's his or

23   her specialty?

24   A.  I have a paper right here.  I cannot describe it.  She's a

25   social worker, because when I call the insurance company, none

D2ekches                        L. Chervin - direct

of the treatment can be approved by insurance company.

Q.  I see, OK.  So she's a therapist of some sort; is that

right?

A.  That's correct.

Q.  Have you ever taken either of your grandchildren to see

psychiatrists?

A.  Yes.

Q.  When was the last time?

A.  Last year.

        THE COURT:  What month?

        THE WITNESS:  I can't recall.  October, November,

something around there.

Q.  Has Svetlana ever struck you?  Has she ever hit you?

        THE COURT:  Objection sustained to the form of the

question.

Q.  Do you know whether Svetlana, aside from what you heard on

the tape or the audio, do you know whether Svetlana has ever

hit either of your grandchildren?

A.  I'm sorry --

        THE COURT:  Objection sustained to the form of the

question.  Let's get the form so it's direct evidence and not

hearsay.

        MR. COHN:  Well, first of all, your Honor, I've asked

her if she knows.  That's all that that question is.  Second of

all, hearsay is admissible in these proceedings, at your

D2ekches                              L. Chervin - direct

1   discretion.  Now --

2              THE COURT:  I know it is, but I'd like to be able to

3   know whether it is hearsay or not.

4              MR. COHN:  I will get to that, your Honor.  I'm trying

5   to lay a foundation.  And I understand the care the Court is

6   taking, but I only asked her now if she knew.  And if she said

7   yes, I'll ask her the source of her knowledge, and then we can

8   make a determination whether it's direct evidence or hearsay

9   and from whom the hearsay occurred.

10             THE COURT:  Well --

11             MR. COHN:  May I ask the question again or is it

12  barred?

13             THE COURT:  As long as it's made clear whether it's

14  hearsay or not.

15             MR. COHN:  Fine.  I'm asking her now does she know.

16  That requires a yes-or-no answer.

17  Q.  Do you know if Svetlana has ever hit your grandchildren?

18  A.  Yes.

19  Q.  And what is the source of that knowledge?  In other words,

20  did you ever witness her hitting her children?

21  A.  Personally not but from children.

22  Q.  Pardon?

23  A.  From the children themselves.

24  Q.  The children told you?

25             On February 10th, 2012, did something happen involving

D2ekches                        L. Chervin - direct

1    Svetlana and --

2            THE COURT:  I have the same problem with --

3            MR. COHN:  Well, if she knows.

4            THE COURT:  Well, I don't think she knows unless she

5    observed it.

6            MR. COHN:  Well, I'm trying not to lead her, your

7    Honor, and it's very difficult.

8    Q.  Did Alan tell you on February 10th, 2012, that Svetlana had

9    hit her husband?

10   A.  Yes.

11   Q.  Did he tell you that?  Do you know?

12   A.  Yes.

13           THE COURT:  When did he tell you?

14           THE WITNESS:  He had run upstairs after his father and

15   tried to explain me what happened.

16           THE COURT:  When did he tell you that?

17           THE WITNESS:  After my son run upstairs, the broken

18   glasses --

19           MR. COHN:  The Judge wants to know when.

20   Q.  Do you recall when he told you?

21           MR. COHN:  May I approach the witness?

22           THE COURT:  Wait a minute.  How long ago?

23           THE WITNESS:  Last year.

24           THE COURT:  What time last year?

25           THE WITNESS:  February.

D2ekches                         L. Chervin - direct

1          THE COURT:  All right.

2     Q.  On March 17th, 2012 --

3          THE COURT:  And your son didn't tell you?  Your son

4     didn't tell you this?

5          THE WITNESS:  My son was -- my son run upstairs with

6     the broken glass and scratch facing, screaming.  And the little

7     one was running after him.  I said, what happened?  He told me,

8     Momma hit Poppa, they was talking.  I said, so what happened?

9     He said, it's no reason, he start screaming.  And I tell him,

10    please come in, please come upstairs, don't be there, and tried

11    to pat him.

12         THE COURT:  Tried to what?

13         THE WITNESS:  To hug him and calm him down.

14         THE COURT:  Oh, you tried to?

15         THE WITNESS:  I always do.

16    BY MR. COHN:

17    Q.  Do you need a minute?

18    A.  Please continue.

19    Q.  Take your time.  Are you all right?  Just get control of

20    yourself if you can.

21    A.  Please continue.

22         MR. COHN:  Your Honor, could we take a five-minute

23    recess?

24         THE COURT:  No.  We've got to go ahead and get through

25    before lunchtime.

D2ekches                      L. Chervin - direct

1    　　　　MR. COHN:  I'm not going to be very long with her,
2    your Honor.
3    　　　　THE COURT:  Let's go ahead.
4    Q.  On March 17th of 2012, did Alec tell you that Svetlana had
5    been abusing him?
6    A.  Yes.
7    Q.  What did he say, if you recall?
8    A.  He said, there's got to be some protection for kids, I
9    cannot take it anymore.  He said, would you guys get divorced
10   as soon as possible so that all this madness stop.
11   Q.  On March 19th of that same year, two days later --
12   A.  Start screaming --
13   Q.  -- did Vadim tell you that he had been beaten again by
14   Svetlana?
15   A.  Yes, he run upstairs -- he always run upstairs -- because I
16   understand she provoked him somehow and he cannot do anything.
17   So he run from her, and he run to me.  And this day she runs
18   after him and it start like fighting, not physical fighting,
19   verbal fighting.  So I get in the middle -- it's not the first
20   time, I always get in the middle -- and tried to break him up,
21   and said, please, go down, it's just words, please.
22   Q.  Did she ever hit you?
23   A.  This is what happened when I tried to break them up,
24   because she beat him with the shoe and she beat him.  I tried
25   to get in the middle, and I get hit in my face.

1            MR. COHN:  I have nothing further, your Honor.

2            THE COURT:  All right.  Any cross-examination?

3            MR. NAFTALIS:  Yes, your Honor.

4    CROSS-EXAMINATION

5    BY MR. NAFTALIS:

6    Q.  Good morning, Ms. Chervin.  My name is Josh Naftalis.  I'm

7    an Assistant U.S. Attorney here in New York.  I just want to

8    ask you a few questions.  If you could answer them yes or no,

9    it will make it go faster.

10   A.  Can you just do me a favor, can you speak a little slowly,

11   a little slowly, not so fast.

12   Q.  Of course.

13   A.  Thank you.

14   Q.  Do you want me to repeat what I said?

15   A.  Not the first part.  I understand, it has to be yes or no.

16   Q.  Now, you said your son is the defendant, Vadim Chervin,

17   right?

18   A.  That's correct.

19   Q.  And you love your son, right?

20   A.  Yes.

21   Q.  You don't want him to go to jail, do you?

22   A.  No.

23   Q.  As a mother, you would do anything for your son, right?

24   A.  Absolutely.  Even if I go instead of him, yes.

25   Q.  And it's your belief that Vadim Chervin's wife, Svetlana,

D2ekches                          L. Chervin - cross

1   is not a fit mother, right?

2   A.  Yes.

3   Q.  And your hope is that if you depict Svetlana as an unfit

4   mother, Vadim Chervin might get a lighter sentence, right?

5           MR. COHN:  Objection to the form of the question.

6           THE WITNESS:  Say it again, please.  Can you repeat?

7           THE COURT:  Do you understand the question?

8           THE WITNESS:  Not fully -- I'm sorry, I cannot speak

9   loud.  Not fully.  Please explain --

10          THE COURT:  You don't understand.

11          MR. HERNANDEZ:  Not fully, Judge.

12          THE COURT:  Not fully.

13          MR. NAFTALIS:  I can repeat it.

14          THE COURT:  All right.  Objection sustained.

15          MR. COHN:  May I respectfully suggest the elision of

16  the word "depict."

17          MR. NAFTALIS:  I'll pick a new work, your Honor.

18  BY MR. NAFTALIS:

19  Q.  Ms. Chervin, your hope is that if you make Svetlana Chervin

20  appear to be an unfit woman, it might help your son, Vadim

21  Chervin, get a lighter sentence, right?

22          THE COURT:  Unfit mother?

23          MR. NAFTALIS:  Yes.

24          THE COURT:  You want to rephrase it?

25          THE WITNESS:  I don't know the meaning of it.  I'm

1    sorry.

2            MR. NAFTALIS:  I'll rephrase it.

3    BY MR. NAFTALIS:

4    Q.  Ms. Chervin, your hope is that if you make it appear as

5    though Svetlana Chervin has not been a good mother, then your

6    son, Vadim Chervin, might get a lighter sentence; isn't that

7    right?

8    A.  No, because she never was a good mother, from my point of

9    view.

10   Q.  Now, you live at 36 Lake Drive in North Brunswick?

11   A.  Yes.

12   Q.  How long have you lived there for?

13   A.  13 years.

14   Q.  And you like living there don't, don't you?

15   A.  Yes.

16   Q.  It's a big house?

17   A.  Yes.

18   Q.  And you live there with your husband, Aron Chervin, right?

19   A.  Yes.

20   Q.  And you live there with your son, Vadim?

21   A.  Yes.

22   Q.  Who else lives there?

23   A.  My grandchild.

24   Q.  That's Alec, the younger one?

25   A.  Alec, yes.

D2ekches                              L. Chervin - cross

1    Q.  Just so it's the four of you?

2    A.  And a friend of mine.

3    Q.  And that house is owned by Aron Chervin and Vadim Chervin,

4    right?

5    A.  What?

6    Q.  The house is owned by Aron and Vadim?

7    A.  No.

8    Q.  Who owns it?

9    A.  Larisa Chervin and Vadim Chervin.

10   Q.  Just the two of you?

11   A.  Yes.

12   Q.  Who pays the mortgage?

13   A.  All of us.

14   Q.  Who is "all"?

15   A.  Me, my son.

16   Q.  You pay out of your pocket?

17   A.  Yes.

18   Q.  Do you work?

19   A.  Yes.

20   Q.  What do you do?

21   A.  I'm working in the law firm as a bookkeeper.

22   Q.  Is that your only source of income?

23   A.  Yes.

24   Q.  If Aron Chervin and Vadim Chervin go to jail, you likely

25   won't be able to afford to pay the mortgage; isn't that right?

D2ekches                         L. Chervin - cross

1    A.  Right.

2    Q.  So you might lose this house on Lake Drive, right?

3    A.  Right.

4    Q.  And you would have to move somewhere else?

5    A.  Right.

6    Q.  And that house likely wouldn't be as nice; isn't that

7    right?

8    A.  Yes.

9    Q.  And you don't want to move out of your home, do you?

10   A.  No.

11   Q.  Now, Ms. Chervin, do you have an email account?

12          MR. COHN:  I'm sorry, I didn't hear the question.

13   Q.  Do you have an email account?

14   A.  Account?

15   Q.  Do you have an email address?

16   A.  Yes.

17   Q.  What is the address?

18   A.  LChervin@Gmail.com.

19   Q.  And you have a password on that account, I assume?

20   A.  Yes.

21   Q.  And only you know that password?

22   A.  Yes.

23   Q.  What is your son's email address?

24   A.  He had few of them.  I don't remember.

25   Q.  Is one of them VChervin@verizon.net?

D2ekches                      L. Chervin - cross

1    A.  Possible.

2    Q.  That one has a password, to your knowledge, right?

3    A.  No.

4    Q.  Do you have access to that account?

5    A.  No.

6            MR. NAFTALIS:  Your Honor, may I approach the witness

7    with an exhibit?

8            THE COURT:  Yes.

9    Q.  Now, Ms. Chervin, I've handed you what's been marked as

10   Government Exhibit 1 for identification.  Do you see it?

11   A.  OK.

12   Q.  Do you recognize this email?

13   A.  What part of the page?  Oh, the --

14   Q.  I'm going to focus on the bottom part, where the date is

15   October 11th, 2012, below that.

16   A.  Uh-huh.

17   Q.  Do you recognize that email?

18   A.  Yes.

19           MR. NAFTALIS:  Your Honor, we'd offer this email.

20   Your Honor, I wanted to question based --

21           THE COURT:  What exhibit, 1?

22           MR. COHN:  If the government is offering this, I have

23   no objection.

24           MR. NAFTALIS:  I'm offering it for the purpose of

25   questioning on it, not vouching for its validity.

D2ekches                          L. Chervin - cross

1        THE COURT:  OK.

2            (Government's Exhibit 1 received in evidence)

3    BY MR. NAFTALIS:

4    Q.  Do you see there's a "from" line, it says

5    VChervin@verizon.net?

6    A.  Yes.

7    Q.  And that's your son, Vadim, right?

8    A.  Yes.

9    Q.  And the to line says Landry Belizaire, and the address is

10   LB@Belizairelaw.com?

11   A.  Yes.

12   Q.  Belizairelaw.com?

13   A.  Yes.

14   Q.  And that's your son's divorce lawyer, right?

15   A.  That's correct.

16   Q.  And then you're on the cc line, which is LChervin@Gmail,

17   right?

18   A.  Right.

19   Q.  So this email is from your son Vadim Chervin; isn't that

20   right?

21   A.  That's how it looks like.

22   Q.  It's not from you, right?

23   A.  It's my writing and it's my text, and it belongs not to

24   this court, to his divorce attorney.  I was asking for

25   protection and help from anyplace I can get.  So I call his

D2ekches                         L. Chervin - cross

1   divorce attorney and he said he told me write down the letter,

2   and it's exactly what I did.

3   Q.  So your testimony is you wrote this email from Vadim

4   Chervin's email account?

5           THE COURT:  Did you write it or did he write it for

6   you?

7           THE WITNESS:  I write.

8           THE COURT:  You wrote it?

9           THE WITNESS:  I wrote it.

10          THE COURT:  And you typed it on the computer?

11          THE WITNESS:  Yes.  That's what I did.

12          THE COURT:  And you used your -- you didn't type it on

13  your own?

14          THE WITNESS:  I don't know what was -- what happened

15  at the time?

16          THE COURT:  You didn't type it on your computer,

17  though, did you?

18          THE WITNESS:  I type on some computer, which was

19  available.  Was open, the words -- my computer didn't have

20  words.  I don't...

21          THE COURT:  So you typed it using Vadim's address?

22          THE WITNESS:  Yes.

23  BY MR. NAFTALIS:

24  Q.  Did anyone help you write this email?

25  A.  No.

D2ekches                        L. Chervin - cross

1  Q.  You wrote this all by yourself?

2  A.  I wrote it by myself.  I was alone home.

3  Q.  Did Vadim Chervin help you write this email?

4  A.  No.

5  Q.  Was he in the room when you wrote this email?

6  A.  No.

7  Q.  Did he tell you to write this email?

8  A.  No.  His attorney did.

9  Q.  And that's --

10            THE COURT:  What did you write --

11            THE WITNESS:  Dr. -- Attorney Belizaire.

12            THE COURT:  What did you examine in order to know the

13  dates in the email?

14            THE WITNESS:  Where I get dates?

15            THE COURT:  Yes.

16            THE WITNESS:  The date I have -- I had notes.

17            THE COURT:  Where are they?

18            THE WITNESS:  It's handwritten notes in the book note.

19            THE COURT:  Did you bring them to court today?

20            THE WITNESS:  No.

21            THE COURT:  You didn't?  Why not?

22            THE WITNESS:  I don't know.

23            THE COURT:  No?

24            THE WITNESS:  Should I?  Nobody told me.

25            MR. NAFTALIS:  Your Honor, I'll get to this because

D2ekches                    L. Chervin - cross

1   the government served a subpoena.  I'm almost on to that,

2   actually.

3           THE COURT:  All right.

4   BY MR. NAFTALIS:

5   Q.  Now, you said this is for your divorce proceeding -- excuse

6   me, your son's divorce proceeding?

7   A.  Yes.

8   Q.  You see it's titled "Motion" in the subject line?

9   A.  He said he's going to do it.

10  Q.  I'm just asking you yes or no.  Do you see it says "Motion"

11  in the subject line of the email?

12  A.  Tell me where to look.

13  Q.  Do you see on the bottom, where there's a vertical line

14  about a third of the way down -- right here, I'm motioning to

15  the bottom third -- it says "Subject:  Motion"?

16  A.  Yes.

17  Q.  Do you know whether a motion was ever filed in

18  Mr. Chervin's divorce proceeding?

19  A.  I believe so.

20  Q.  Do you know, yes or no, one way or the other?

21  A.  I don't know.

22  Q.  Now, the email is dated October 11th, 2012, right?

23  A.  Right.

24  Q.  And your son was convicted in August, which is before then,

25  right?

D2ekches                         L. Chervin - cross

1    A.  Right.

2    Q.  And this email has a number of specific allegations against

3    Svetlana, Vadim's wife; isn't that right?

4    A.  Right.

5    Q.  With specific dates, right?

6    A.  Right.

7    Q.  Did you ever see any bruises on the children?

8    A.  No.

9    Q.  Did you ever talk to any doctors about this alleged abuse?

10   A.  Yes.

11   Q.  You did?

12   A.  Yes.

13          MR. NAFTALIS:  Your Honor, may I approach with

14   Exhibit 2?

15          THE COURT:  Yes.

16          Thank you.

17   Q.  Now, Ms. Chervin, I've handed you what's been marked as

18   Government Exhibit 2.  Do you see that?

19   A.  Yes.

20   Q.  Do you recognize that document?

21   A.  Yes.

22   Q.  And that's a subpoena dated January 24th, 2013, from the

23   U.S. Attorney's Office to you, right?

24   A.  Yes.

25   Q.  Let me direct you to page 2.  To you see it says "Rider" on

D2ekches                        L. Chervin - cross

1    top?

2    A.  Yes.

3    Q.  Let me read it to you.  It says --

4          THE COURT:  I don't see "Rider" on top.

5          MR. COHN:  That's page 3.

6          THE COURT:  I don't see "Rider" on the top.

7          MR. NAFTALIS:  On the second page, your Honor.

8          MR. HERNANDEZ:  It's the third page.

9          MR. COHN:  May I inquire, your Honor, whether --

10         THE COURT:  I don't have a rider on top.

11         MR. COHN:  I see.  OK, there's a duplicate page on my

12   copy, and that's why I'm confused.  And I withdraw whatever it

13   was --

14         MR. HERNANDEZ:  Try the third page, Judge.

15         MR. COHN:  -- that I had in mind.

16         MR. NAFTALIS:  Your Honor, the first page is the cover

17   of the subpoena, and the second page is the rider to the

18   subpoena.

19         THE COURT:  Oh, I see.

20   BY MR. NAFTALIS:

21   Q.  Ms. Chervin, are you on page 2?

22   A.  Yes.

23   Q.  Do you see it says in the first paragraph, "Providing

24   documents in your possession, custody and/or control regarding

25   any of the events described in the attached email dated

D2ekches                    L. Chervin – cross

1    October 11th, 2012.  This request includes, but is not limited

2    to, police reports, medical records and reports made to state

3    or federal agencies."

4            Do you see that?

5    A.  Yes.

6    Q.  And then if you flip the page, there's an email, which is

7    the way it was originally given to us, and my understanding

8    from Mr. Cohn is this is the same email as Exhibit 1.

9            Do you see that?

10   A.  Yes.

11   Q.  Did you provide any and all documents in your possession,

12   custody and/or control regarding the events described in this

13   October 11th email?

14   A.  Can you rephrase, please?

15   Q.  Did you provide -- Exhibit 3, which you looked at with

16   Mr. Cohn is a stack of documents you gave to your lawyer,

17   right?

18   A.  Yes.

19   Q.  And that was your response to this subpoena; isn't that

20   right?

21   A.  Yes.

22   Q.  And did you provide any and all documents in your

23   possession, custody control regarding the events described in

24   the October 11th email?

25   A.  Yes.

D2ekches                          L. Chervin - cross

1    Q.  You told the judge that there were some notes about the

2    alleged incidents in the email, right?

3    A.  Right.

4    Q.  They are not in the documents you produced, are they?

5            MR. COHN:  Objection; no foundation that they still

6    exist.  I'd ask --

7            THE COURT:  Objection overruled.

8    Q.  You can answer.

9    A.  No, I don't.

10   Q.  You didn't provide any documents?

11   A.  The handwritten documents?  No.

12   Q.  You didn't provide any police reports, medical records or

13   reports to state or federal agencies, did you?

14   A.  I provide medical records.

15   Q.  About your children?

16           MR. COHN:  Objection.

17   A.  It's not my children.

18           MR. COHN:  There's no foundation that such things

19   exist.

20   Q.  About your grandchildren?

21   A.  Vadim Chervin has all the documents.

22   Q.  And you live with your son, right?

23   A.  Right.

24   Q.  All of the documents that you provided to us are your

25   medical records; isn't that correct?

D2ekches                        L. Chervin - cross

1    A.   That's what I have been told.

2    Q.   None of them have anything to do with your grandchildren,

3    right?

4              MR. COHN:   Objection to the form.

5              THE COURT:   I will allow the question.

6    Q.   None of the documents in Exhibit 3 have anything to do with

7    your grandchildren, right?

8    A.   Except my letter.

9    Q.   Except the dentist?

10   A.   The dentist.

11   Q.   We'll get to that.  Let's look at paragraph 2 of the rider,

12   where it says, "Provide any and all communications, including

13   emails, in your possession, custody and/or control regarding

14   any of the events described in the attached email dated

15   October 11th, 2012," right?

16   A.   Right.

17   Q.   And, again, you've complied with that, in your view, right?

18   A.   Right.

19   Q.   And all the documents that exist are Exhibit 3?

20             THE COURT:   Are Exhibit 3?

21             MR. NAFTALIS:   Which is the exhibit that Mr. Cohn --

22   it's Government Exhibit 3, which is the exhibit that Mr. Cohn

23   introduced on direct.

24   Q.   Right, Ms. Chervin?  You gave all the documents responsive

25   to that second paragraph's request, right?

D2ekches                      L. Chervin - cross

1   A.  Yes.

2   Q.  And I believe we covered this:  There are no police reports

3   in there, right?

4   A.  No.

5   Q.  You never called the police to report any of the alleged

6   abuse, right?

7   A.  No.

8   Q.  Exhibit 3 contains no reports to child services, right?

9   A.  No.

10  Q.  And you never called child services to report any of the

11  alleged abuse, right?

12  A.  No.

13  Q.  Sitting up on the judge's bench is Exhibit 3, which was

14  what Mr. Cohn gave you.  Would you grab that.  Yes.

15          Can you flip to the second page, Ms. Chervin.

16  A.  Yes.

17  Q.  Do you see it's an email, it says Gmail from Alla

18  Pavlushkin?

19  A.  Yes.

20  Q.  And it's dated October 6th, 2012?

21  A.  October 6th?

22  Q.  To the right.

23  A.  Yes.

24  Q.  And that's an email to your email address, LChervin@Gmail,

25  right?

D2ekches                    L. Chervin - cross

1   A.  Yes.

2   Q.  It's not to VChervin, right?  It's not to Vadim, it's to

3   you?

4   A.  To me.

5   Q.  If you look in the first part of the email, it says,

6   treatment record for 3/21/12, right?

7   A.  Right.

8   Q.  And Dr. Pavlushkin is a dentist; isn't that right?

9   A.  Yes.

10  Q.  Now, I'm going to have you look in a second back to

11  Exhibit 3.  This has to do with an incident involving your

12  tooth, right?

13  A.  Right.

14  Q.  Now, let's look at the email, which is Exhibit 1.  Can you

15  flip to page 2.  Do you see where it says 3/19/12?  It's about

16  a third of the way down.

17  A.  Yes.

18  Q.  It says -- I'll read it to you -- "On 3.19.12, my son came

19  upstairs after being beaten once again and another pair of

20  glasses broken.  She came upstairs and started aggressively

21  demanding that I would not get involved in her affairs and her

22  family.  She started hitting my son in front of me.  I tried to

23  separate the bighting, so she hit me instead with her shoe and

24  broke my front tooth and the bridge," right?

25  A.  Right.

D2ekches                         L. Chervin - cross

1   Q.   So what you alleged happened is that Svetlana hit you with

2   a shoe, right?

3   A.   Yes.

4   Q.   And broke your bridge?

5            If you could flip back to the email from your

6   dentist --

7   A.   Uh-huh.

8   Q.   -- and if you look in the second line -- excuse me, the

9   third line, it says, "Patient states that she is currently

10  under a lot of stress.  Patient complains that she is grinding

11  her teeth at night," right?

12  A.   Right.

13  Q.   You don't say you got hit in the face with a shoe, do you?

14  A.   How could I?

15  Q.   The dentist does not say that you reported getting hit in

16  the face with a shoe, right?

17  A.   No, sir.

18  Q.   The dentist says that you were grinding your teeth, right?

19  A.   Yes, sir.

20            MR. NAFTALIS:  One second, your Honor?

21            (Pause)

22            MR. NAFTALIS:  No further questions, your Honor.

23            MR. COHN:  Briefly, your Honor?

24            THE COURT:  Yes.

25  REDIRECT EXAMINATION

D2ekches                    L. Chervin - redirect

1    BY MR. COHN:
2    Q.   This subpoena that you received, did you turn it over to
3    your attorney?  Did you consult -- you have an attorney, do you
4    not?
5    A.   Yes.
6    Q.   And that's Mr. Stein, who's out here in the audience?
7    A.   Mr. Stein, yes.
8    Q.   Did you go over the subpoena with him?
9    A.   Yes.
10   Q.   Did you consult me about the subpoena?
11   A.   Yes.  Subpoena about you -- with you?
12   Q.   Yes.  Did you talk to me --
13   A.   No.
14   Q.   -- about how to comply with the subpoena?
15   A.   No.
16   Q.   And Mr. Stein asked you questions about what documents
17   exist, right?
18   A.   That's correct.
19   Q.   Did he ask you whether there were any notes for any of the
20   documents that you had created -- that you had supplied?
21   A.   No.
22   Q.   Do those notes still exist?
23   A.   I don't know.
24   Q.   Did you look for them?
25   A.   No.

D2ekches                    L. Chervin - redirect

1   Q.  Did you have any idea that they were required?

2   A.  No.

3   Q.  Did the word "notes" appear anywhere in the rider?

4   A.  I never see rider.  I see only first page.

5          MR. COHN:  I have nothing further.

6          THE COURT:  All right.

7          MR. NAFTALIS:  Your Honor, I just have one question.

8          THE COURT:  Yes.

9   RECROSS EXAMINATION

10  BY MR. NAFTALIS:

11  Q.  Ms. Chervin, looking at Exhibit 1, this email is from

12  October 2012, right?

13         MR. HERNANDEZ:  Objection; beyond the scope of

14  redirect.

15         MR. NAFTALIS:  Your Honor, this is directly within the

16  scope.

17         THE COURT:  What am I supposed to look at?

18         MR. NAFTALIS:  The date of the email is from

19  October 2012; isn't that right, Ms. Chervin?

20  Q.  Do you see on the bottom --

21  A.  Which -- the bottom?

22  Q.  The bottom of the email, Exhibit 1, about a third of the

23  way down the first page.

24  A.  Yes.

25  Q.  If you flip to the second page, the events in question are

D2ekches                          L. Chervin - recross

1   from February, March, June, and again October of 2012, right?

2   A.  Right.

3   Q.  So you kept notes apparently from back to February of 2012,

4   as of when you wrote this email, right?

5   A.  Yes.

6   Q.  And they were important enough to keep then, right?

7   A.  Probably, yes.

8   Q.  And you're making allegations against Ms. Svetlana Chervin,

9   right, based on these notes?

10  A.  It's not allegation; it's truth.

11  Q.  But they're not important enough to keep after you make the

12  allegations; isn't that right?

13          MR. COHN:  Objection to the form.  First of all, she

14  didn't say she didn't keep them.  She says she doesn't know.

15  Q.  You wrote an email based on these notes, you say, right?

16  A.  Right.

17  Q.  We asked for all documents about this email, right?

18  A.  Right.

19  Q.  And you don't give us the notes, right?

20          MR. COHN:  Objection to the form of the question.

21  Argumentative.

22          THE COURT:  Objection overruled.

23          THE WITNESS:  I wasn't told by anybody I need any

24  other documents, handwritten or something.  I came to my

25  attorney, Mr. Stein.  I brought him subpoena, and he told me

D2ekches                    L. Chervin - recross

1    what to provide, and I provide it.  That's all, that's the end

2    of it.

3              MR. NAFTALIS:  Your Honor, we have no further

4    questions.

5              MR. COHN:  And I have no recross --

6              THE COURT:  All right.

7              MR. COHN:  -- or redirect or whatever it is.

8              THE COURT:  You're excused then.

9              Any further witnesses?

10             MR. COHN:  No.

11             THE COURT:  Any further witnesses from the government?

12             MR. NAFTALIS:  No, your Honor.

13             THE COURT:  All right, this family court proceeding is

14   adjourned.

15             MR. COHN:  That was supposed to be my joke, Judge.

16             MR. HERNANDEZ:  Judge, can we excuse the witness?

17             THE COURT:  I hate to beat you to it, Mr. Cohn.

18             You're excused.

19             (Witness excused)

20             THE COURT:  Are you ready to proceed on anything else?

21             MR. HERNANDEZ:  The government's ready, your Honor.

22             THE COURT:  Are you ready to proceed on the matter

23   that was scheduled for today, 10:00 o'clock?

24             MR. COHN:  Yes, your Honor.

25             THE COURT:  You're ready to proceed with the

D2ekches

sentencing?

        MR. COHN:  If your Honor is ready and is prepared to
rule.

        THE COURT:  Well, I don't know whether I'm going to
rule.  I'm prepared to go on with the sentence, but I'm not
prepared necessarily to rule on any family court matters.

        MR. HERNANDEZ:  I don't think anyone's asking you to,
Judge.

        MR. COHN:  No, but, your Honor, we are asking you to
rule on whether or not the children will suffer inordinately if
he goes to jail, which is part of the guidelines and has been
briefed.  So to ask this in terms of a family court proceeding
is perhaps arch, but I don't believe it's correct.  The
question is not really is she a fit parent.  The question is
will the children suffer if the children are left entirely to
her tender mercies, and the answer is, in my view, that they
will.

        THE COURT:  I don't know whether the older boy -- he's
18.  I don't know what New Jersey law would be with respect to
what sort of custodial arrangements would be made.  What's the
answer there?

        MR. COHN:  My assumption is, your Honor, that the
Jersey courts could not force him to live with Svetlana.  What
her moral suasion is or fear of her is another story, but I
don't believe that the Jersey courts would say to Alec, who is

D2ekches

1    now 18, you must live with your mother, and that they would

2    take into account, if they had any jurisdiction at all, what he

3    wanted.

4            THE COURT:  Both sides agree?

5            MR. HERNANDEZ:  Judge, I can't agree because I don't

6    know what the law is in New Jersey.  But I will say, we're

7    obviously focused on one issue this morning.  It is one issue

8    of many.  There's also the matter of the history and

9    characteristics of the defendant, the offense, the need for

10   deterrence, the need to punish the defendant, a whole host of

11   factors.  So we think that we will package our argument and

12   present all the factors together for your Honor to decide, and

13   we hope that the testimony has helped you to resolve one of the

14   issues.

15           THE COURT:  All right.

16           I have a presentence report before me, which I

17   received on January 2nd, 2012, and which was prepared on

18   October 15th, 2012.

19           Have you and Mr. Chervin read the presentence report,

20   Mr. Cohn?

21           MR. COHN:  We have.

22           THE COURT:  Are there any changes to be made in it?

23           MR. COHN:  I believe that -- I believe we made a

24   submission and there was a final one.  And after the final

25   report, we had no changes.

D2ekches

1           THE COURT:  Mr. Chervin agrees to that --

2           THE DEFENDANT:  Yes, your Honor.

3           THE COURT:  -- is that true?

4           MR. COHN:  He said yes.

5           THE COURT:  In addition, I have the government's

6    sentencing memorandum dated January 9th, and their supplemental

7    memorandum dated February 12th.  And I have your letter of

8    January 12th, 2013, Mr. Cohn, and the various documents that

9    were admitted here at this hearing, as well as a letter from

10   you, Mr. Cohn, dated January 11th containing various documents

11   that pertain to medical records for Alan Chervin, and the

12   letters from Alec Chervin.  And I think that's all.

13          Is there anything else I should have before me before

14   I hear from you on sentence?

15          MR. HERNANDEZ:  No, Judge.  You mentioned both of our

16   submissions.

17          THE COURT:  OK.

18          All right, then I'll hear from you on sentence,

19   Mr. Cohn.

20          MR. COHN:  Well, your Honor, this is a particularly

21   difficult case.  And I understand that the Court, number one,

22   would probably be concerned with the prior conviction of 16

23   years ago for fraud, which apparently you took similar material

24   into account when you sentenced Mr. Pina, and the fact that the

25   jury disbelieved Mr. Chervin's testimony, which the government

D2ekches

characterizes in bold terms as perjury and speaks eloquently

about.

        And I understand all of that.  And given this scheme,

and given everything, I would normally expect some jail

sentence.  A very fine judge said, never recommend a sentence

to a judge when he might have something less in mind.  And so I

try not to do that.  But I think that the issues about the

family and the children, and particularly the younger one, are

compelling.  And I think what's happened here today indicated

that, at the very least, the mother of these children is

erratic, that she can't be trusted with their safety, that in

addition to the physical abuse, there is the emotional problem

that children have when trying to deal with a natural parent

and the effects of that.  Alec, the elder, has clearly evinced

a desire to stay with his father -- he won't share a cell with

him -- and the younger one is staying with the mother during

the week and because he feels compelled to do that.

        But he is being beaten, he is being abused, he is

being threatened, his medical care is being ignored, and if

Mr. Chervin is not there to at least put in input and to go to

whoever it is that deals with it, to taking the children to

doctors -- the younger boy has a seizure disorder.  Ms. Chervin

discounts that, and says he's off medication.  Why is he off

medication?  Because she's against medication except if it's

some root or other, and she treats people, which she has no

D2ekches

1    business of doing it, and she gets messages from on high, and

2    these children are in danger, particularly the younger.  The

3    older has got his problems.  In addition, I will tell you that

4    he is on antidepressants and that there has been some

5    discussion, although you don't have a record on it because I

6    just got them, but that there's been some discussion of

7    contemplation of suicide.  I don't believe he's a suicide risk,

8    but there's been talk about that.

9           So what do we have if he goes to jail and he's not

10   available?  And I have not suggested a sentence which would be

11   akin to probation.  You can't give him probation.  I think it's

12   a Class A felony.  I mean you could give him time served and

13   supervised release under certain terms.  And that's essentially

14   what I'm suggesting, not for his sake and not for the sake of

15   the processes of this Court, which I understand you might take

16   offense at as a judge, not as a person, but because the

17   children require him.

18          The Second Circuit has spoken to it and laid it out

19   and we briefed it.  You in fact, in another case -- and that's

20   in the brief -- granted such an application.  I don't know

21   whether the facts of the case were as egregious as these, but

22   the fact is, that we haven't suggested that he go and sin no

23   more.  What we've suggested is that the Court can impose a jail

24   sentence and it ought to be done on weekends, that if you did

25   what I think is just for the benefit of the children, not for

D2ekches

1    him, that you would sentence him to time served, a year -- 52

2    weeks of weekends and then supervised release for the balance

3    of the term of three years or whatever that is.

4          I don't think that that's going to satisfy the

5    emotional response of the Court.  I think that the Court -- I

6    know you professionally a long time.  You're a very sensitive

7    person and very kind, but this is a trial, this is a case that

8    took up the Court's time and that I -- from things you've said,

9    I think that you did not disagree with the jury's verdict.  I'm

10   not arguing that at all.  And this is the first time I've ever

11   made this kind of application about family.  I understand, as I

12   said in my letter, that families suffer always when one parent

13   or another goes away, when a spouse goes away, that the

14   finances are always difficult, and if it was only the finance

15   and if it was only that they were going to lose the house,

16   tough.  But it's not.  The 11-year-old's well-being is in

17   danger, in my view.  And I think that the testimony of this

18   woman here indicated that.

19         When confronted with a tape recording of an

20   11-year-old reporting on the telephone, she said it was a high

21   likelihood that her husband had put him up to it.  I don't

22   think the government is going to argue that.  I don't think

23   that they believe that.  I think this is a child who is in

24   danger.  The fact that nobody went to the police, I think, is

25   shameful, but given the community and that it's an immigrant

D2ekches

1    community, it doesn't surprise me.  These things are kept.  But

2    the fact is that you have an opportunity, if you so desire --

3    and you have to make findings about it according to the

4    Circuit -- to protect at least the younger child, if not --

5              THE COURT:  Well, does the government agree that the

6    telephone call was a telephone call from the son at the

7    mother's address to --

8              (Pause)

9              MR. COHN:  Your Honor, would you eject this woman from

10   this courtroom?

11             THE COURT:  Whatever you're saying back there,

12   Ms. Chervin, is not being recorded, and I can't hear it.

13             MS. S. CHERVIN:  I'm sorry?

14             THE COURT:  I can't hear it.  So it doesn't do any

15   good.  If you have something to say, you should have said it

16   earlier.

17             MS. S. CHERVIN:  He's -- my husband wants --

18             MR. COHN:  Your Honor, she's being disruptive.  Can

19   you have her removed?

20             THE COURT:  No, I'm not going to have her removed.

21   She's still a wife of the defendant at this point.

22             MR. HERNANDEZ:  Judge, we agree that that is Vadim

23   Chervin speaking to his son.  That's about as far as we'll go.

24   The substance of that call, there are many reasons to doubt the

25   veracity of it, number one, and, number two, even if you take

D2ekches

1   it at its face -- because I listened --

2           THE COURT:  You'll address that in a later time.

3           MR. HERNANDEZ:  OK, I'll get my shot.

4           THE COURT:  I want to hear Mr. Cohn without

5   interruption.  I interrupted it.

6           MR. COHN:  That's OK.  We hope we're interrupted,

7   because the Court hasn't made up its mind.

8           I've said it -- I don't have to belabor it anymore --

9   I think that you have to protect Alec.  And the only way to do

10  that is by what I've suggested, while still protecting the

11  substance of the Court's responsibility to the criminal justice

12  system by including some penal penalty, and that's what I'm

13  suggesting.

14          THE COURT:  And I take it you're relying on the United

15  States versus Johnson?

16          MR. COHN:  Yes.

17          THE COURT:  All right, Mr. Hernandez.

18          MR. HERNANDEZ:  Judge, before I address sentencing, if

19  I could, I just want to address -- this might be my only chance

20  to just make one comment about the testimony.  We heard

21  testimony from Larisa Chervin about exchanges she may have had

22  with Mr. Stein about a subpoena, and I just want to make clear,

23  so that there's no suggestion otherwise, that we're not in any

24  way suggesting that Mr. Stein did anything wrong or is at fault

25  for anything that was produced.  In my experience, Mr. Stein is

D2ekches

1   a fantastic member of the bar, and we simply want to make an

2   impeachment point that if these notes existed, she might have

3   produced them.  It's not a significant point, but I just didn't

4   want there to be any suggestion that we were impugning

5   Mr. Stein in any way.

6           With respect to this case, Judge:  Let me begin where

7   Mr. Cohn began.  He said words to the effect that this is a

8   difficult case.  But we have been speaking a lot about

9   Mr. Chervin's family but not about the offense.  And when it

10  comes to the offense and the crime here, it wasn't a difficult

11  case.  It took the jury an hour and ten minutes to convict

12  Mr. Chervin of knowingly and willingly participating in a fraud

13  that cost over $1.4 million and over 2 million in bills that

14  were submitted, for what was clearly a violation of the law, to

15  have nonphysicians running a clinic to provide unnecessary

16  medical care.  And Mr. Chervin was at the heart of this because

17  he was the biller.  He knew exactly how much money was coming

18  through, he was coding all of the bills.  And as we heard from

19  the wire, he knew precisely this was a fraud.  He knew that

20  Dr. Gibbs wasn't running this clinic, that it was really

21  Vyacheslav and Aron that was running it.  So the evidence was

22  quite clear.  That's why it didn't take the jury very long.

23          One other issue your Honor is going to have to decide

24  is whether obstruction points are merited based on the false

25  testimony that Mr. Chervin provided.  He chose to testify -- he

D2ekches

didn't have to -- but then he chose again to lie when he was on

the stand.  He denied what was plain as day on the wire, he

denied his knowledge, and then he concocted a story that he

thought would get him out of this prior conviction that he had

with some of the same players in the current fraud.  So he

spins this yarn about not having had money for an attorney, and

then he's confronted with not only a transcript but a form that

he signed from New Jersey that informed him that he could have

an attorney appointed to him free of cost if he couldn't afford

one.  It backfired.  I think that the jury certainly didn't

believe him.  I don't think the Court believed him on that.

          And we think that obstruction points are merited.

This is not an insignificant fraud.  It only ended in October

of 2010 because the government arrested the participants in the

fraud.  It likely would have continued.

          And Mr. Chervin is a recidivist.  I understand that

the conviction is old, but here's what makes that fact less

relevant:  Mr. Chervin has now been convicted of participating

in a financial fraud with the same group of people twice.  He

knew that Aron Chervin was a part of the old New Jersey case,

he knew that Vyacheslav was -- this is what Vadim said -- he

said he knew he was a felon but he didn't know exactly what

for.

          And so now he's been caught for a second time

participating in another financial fraud.  And his explanations

D2ekches

1   for both are similar in ways that just aren't credible.  He

2   said that in the oil and gas case he was just a bookkeeper,

3   making transactions.  And here in this case he testified that

4   he was just the biller, that he had no idea what was going on,

5   despite all the evidence from the wire, despite the testimony

6   from Vyacheslav.

7          So while your Honor is going to have to make some

8   decision about the family circumstances, which I'll address in

9   a minute, this is clearly a serious offense that deserves

10  punishment.  Mr. Chervin needs to be personally deterred from

11  doing this again.  There needs to be a message of deterrence

12  for others in this area of healthcare fraud and insurance

13  fraud.

14         And when it comes to Mr. Chervin's family

15  circumstances, Mr. Chervin is no different in this respect,

16  that men and women come before your Honor all the time who have

17  families who have committed crimes and they are sentenced to

18  terms of imprisonment because they have committed serious

19  offenses.

20         I think the testimony here, as well as some of the

21  arguments we have made in our sentencing submission, establish

22  a few basic points:  Number one, that the children are safe and

23  are going to be cared for by Svetlana Chervin.  Mr. Chervin's

24  older son is 18, thinking about going to college.  He's making

25  his own decisions, he's living at 36 Lake Drive with his

D2ekches

1    grandmother.  He is much older and more in control of his

2    destiny.

3          Now, we have heard that the children have seen some

4    therapists and phycologists.  But I believe that Mr. Chervin's

5    older son was only taken to a psychologist or a therapist I

6    think at some point after Vadim Chervin's conviction.  And as

7    you saw from the testimony here today, that was news to

8    Svetlana Chervin.  And I'm not going to go into great detail,

9    but you've read the submissions.  Obviously, this young man is

10   greatly distraught, he's going through a bit; his parents are

11   divorcing, his father is facing a potential jail sentence.  And

12   I would implore Mr. Cohn, I would implore the Chervins,

13   everyone who's here who cares about that young man, to watch

14   him carefully, do everything possible to make sure that he

15   doesn't harm himself, that he feels well, as well as their

16   younger son.

17         But the younger son lives with Svetlana Chervin as is,

18   in a nice home, where his grandmother also lives.  She's

19   providing support as best as she can --

20         THE COURT:  His other grandmother?

21         MR. HERNANDEZ:  I'm sorry?

22         THE COURT:  He's got two grandmothers.

23         MR. HERNANDEZ:  He's got his grandmother two blocks

24   away, on 36 Lake Drive.  There's a fair amount of family

25   support.

D2ekches

 1          And the allegations of abuse I don't think are frankly

 2   credible.

 3          Let's take that audiotape that we heard.  First of

 4   all, the question was being done by Vadim Chervin, which we

 5   don't know exactly the circumstances, we don't who was in what

 6   room or how the questioning was conducted, number one.

 7          Number two, there were a lot of objectionable leading

 8   questions in that audiotape.  And if you listen to it

 9   carefully, Judge -- because at first blush it may sound like a

10   report of horrific abuse -- what was being said was, he had

11   come home late, his mother was upset about it, he says that his

12   mother was hitting him, but it was somewhere on the body, he

13   was far away on the bed is what he said.  And then at one

14   point, Judge -- I had to listen to it two or three times to

15   hear this -- he says she started hitting me with my bookmark.

16   With a bookmark, Judge.

17          Vadim Chervin goes on to ask about whether he was hurt

18   or whether he was harmed.  He starts to give a sort of no

19   answer, and then he says, you know, yes, it hurt but it didn't

20   hurt that bad.  And then there's the exchange about the phone.

21          I don't think whatever it was that transpired there

22   can be classified as a form of physical abuse, even if she was

23   hitting him with a bookmark, even if she hit him far away on

24   the bed.  It's 2013, I understand, but there used to be a thing

25   called spanking, there used to be a form of corporal punishment

D2ekches

1      that families participated in, and each family makes their own

2      decisions about what it is.  But the Court has no evidence of

3      any bruises, cuts or real physical damage to any of the

4      children, no medical records, no reports to physicians, no

5      reports to child services, to corroborate any of this.

6              And there is an explanation for it.  Svetlana Chervin

7      said, I provide the discipline, I'm the disciplinarian.  And I

8      think that includes some form of corporal punishment but not to

9      the level of abuse.  And I don't think we've heard any

10     testimony that Vadim Chervin does that.  But that doesn't mean

11     that the children cannot be provided a safe, stable environment

12     if Mr. Chervin is sentenced to a term of imprisonment.

13     Svetlana Chervin said that she wants her children to continue

14     to have a relationship with their father.  I think that they

15     will.

16             But the evidence in the record shows a lack of proof.

17     And we chose one very specific example to question Larisa

18     Chervin about, the allegation that on March 19, 2012, she was

19     hit by a shoe that Svetlana Chervin was swinging, in the mouth,

20     and it broke her tooth.  And the only evidence to corroborate

21     this that's been presented was an email from her dentist.  And

22     the only attribution to why she was getting that tooth fixed

23     was that she was having stress and grinding her teeth.  So

24     there's really a lack of corroboration of these terrible

25     allegations, frankly.

D2ekches

1          So, in sum, we think that the evidence that you've

2     heard doesn't meet the burden of showing that there's a

3     physical danger.  And we haven't addressed maybe the most

4     significant form of impeachment, which is if Vadim Chervin

5     really thought that Svetlana Chervin was unfit and physically

6     abusive , he would have alleged so in his divorce complaint,

7     which was filed 13 or 16 days after he was convicted.  But he

8     didn't, Judge.  He said, I filed divorce for abandonment and

9     irreconcilable differences.  But he's never alleged in the

10     actual forum which will decide custody that Svetlana Chervin is

11     abusive.  It's never come up.  The reason it hasn't come up,

12     Judge, is I don't think it's true.

13          THE COURT:  Well, you yourself said that this email

14     was marked "Motion."  Have you looked at the actual proceedings

15     in New Jersey and been able to ascertain that it has never come

16     up?

17          MR. HERNANDEZ:  I can point to one thing in the record

18     and one thing that's not, Judge.  In our sentencing submission,

19     the most recent one, we have an FBI 302 when Special Agent

20     Richards and Vassilakos interviewed Svetlana Chervin, and she

21     said that Vadim Chervin has never alleged in the divorce

22     proceeding that she's physically abusive.  So that's something

23     that's in the record.

24          Something that's not in the record that would be a

25     proffer from counsel is that I spoke to Svetlana Chervin's

D2ekches

1    former counsel, a gentleman named Frank Vitterito, and he

2    represented to me that there has been no allegation in the

3    divorce proceeding as of -- I spoke to him maybe two weeks

4    ago -- of abuse or endangerment by Svetlana Chervin.  So I

5    think that that's a powerful form of impeachment.  And the

6    inference to be drawn, Judge, is that it's being raised only in

7    this forum not because there's merit to it but because Vadim

8    Chervin hopes that you will believe it and give him a lighter

9    sentence.  And obviously that's not proper.

10         So, Judge, I won't belabor the point any more unless

11   you have some questions, but we think you obviously have to

12   consider the offense, all these other 3553(a) factors besides

13   the family factors, but when they're all considered, we think

14   that an obstruction enhancement is warranted here, and we think

15   your Honor should consider all of those factors when imposing a

16   sentence.

17              THE COURT:  Mr. Cohn, do you want to reply to that?

18              MR. COHN:  No.

19              THE COURT:  Mr. Chervin, before I arrive at a

20   sentence, would you like to address the Court in any way in

21   connection with your sentence?

22              THE DEFENDANT:  No, your Honor.

23              THE COURT:  All right.

24              While I consider the sentence, I will first make the

25   necessary guideline calculations.

D2ekches

1           The charges here are conspiracy to commit mail fraud

2      and healthcare fraud in violation of 18, United States Code,

3      Section 1349, and the second count, of healthcare fraud, in

4      violation of 18, United States Code, Section 1347.

5           The two counts are considered together and pursuant to

6      the guidelines are evaluated under 2B1.1, which provides for a

7      base offense level of 7 pursuant to Subsection (a)(1) of 2B1.1.

8      Because the loss exceeded $1 million but did not exceed

9      $2.5 million, the base offense level is increased by 16 levels

10     pursuant to guideline 2B1.1(b)(1)(L).  And since the offense

11     involved sophisticated means, two levels are added to that

12     pursuant to guideline 2B1.1(b)(10)(C), which results in an

13     adjusted offense level of 25.  The defendant has not shown an

14     acceptance of responsibility under guideline 3E1.1(a), and

15     therefore the total offense level is 25.

16          The criminal history of the defendant is Criminal

17     History Category I because of his prior conviction for fraud

18     does not fall within the period of time that is necessary for

19     it to be included.

20          Now, the government is asking, I think, for an

21     additional two levels for obstruction of justice.  I have some

22     difficulty with that, and I don't quite know how to explain it.

23     But particularly with the older crime, I think that a lot of

24     defendants have difficulty in accepting their guilt,

25     particularly in white collar crime cases, and they start

D2ekches

1    reasoning about it, and reasoning that they could never have

2    done it.

3          So the problem I have is, though I think that the

4    testimony is contrived or was contrived, I'm not sure it was

5    intentionally contrived.  This involves an assessment of the

6    personality.  I don't know that I have enough to make that

7    assessment in the way that I'm concerned about.

8          Similarly, with respect to his testimony at trial, it

9    seemed to me that it was clear from the tape of the recordings

10   and the nature of the conversations with Mr. Dobrer and Aron

11   Chervin, that the testing -- and correct me if I am wrong --

12   which was confined to electrical -- I've forgotten the term.

13         MR. HERNANDEZ:  Electrodiagnostic studies.

14         THE COURT:  -- electrodiagnostic nerve tests showed an

15   agreement prior to their being taken, to give them a billing of

16   so much for -- at a certain range and that all the tests were

17   for those kinds of tests.  They were not all other tests, but I

18   can't --

19         MR. HERNANDEZ:  Your Honor's recollection --

20         THE COURT:  -- be sure of that?

21         MR. HERNANDEZ:  Your Honor's recollection is correct.

22   The testimony which we heard from the wire was that Mr. Chervin

23   and other coconspirators agreed on a set number of tests and a

24   range of 3600 to 4100 dollars in billing per patient.  We then

25   heard testimony from a witness from Allstate, a witness from

D2ekches

```
 1   GEICO, that -- and I can't recite it with precision because I
 2   don't have it in front of me -- that in sum and substance what
 3   was submitted fell within the range discussed by Mr. Chervin
 4   and all the coconspirators.  And the government argued in
 5   summation that legitimate medical practices don't have the
 6   billing manager and the office manager predetermine the number
 7   of tests and how much they're going to charge per person before
 8   they even see them.
 9               THE COURT:  But my question went to whether all the
10   tests were -- the discussion was of those type of tests, but
11   whether the tests themselves that were billed were limited to
12   those kinds of tests.  I'm not certain.
13               MR. HERNANDEZ:  Judge, the testimony was about two
14   types of tests, NCV and EMG, I believe.  I'm being told yes.
15               The testimony was certainly about those two forms of
16   tests.  Those were the predominant tests.  I can't say for
17   certain, though, whether there were other services or tests
18   provided, because they weren't the focus of the indictment and
19   thus not the trial.
20               THE COURT:  Other defendants in this case recognized
21   from the, as I recollect it, from the overwhelming number of
22   tests of the same sort, that something was amiss and suspected
23   and decided that they should not participate further at a
24   certain point because of that.
25               MR. HERNANDEZ:  Yes, Judge.  I think maybe what you're
```

D2ekches

1    alluding to, there was maybe another physician who felt

2    uncomfortable, is what you may have heard.  I don't remember if

3    it was in the trial, but there was another physician who was

4    kind of uncomfortable being pushed, in his view, to perform

5    more tests.  I don't recall whether -- his name is

6    Dr. Chaudhry -- his testimony was in our trial; it may have

7    come from another plea or something along those lines.  Your

8    Honor, I think maybe it's Vyacheslav Dobrer may have testified

9    about his interactions with that physician who was

10   uncomfortable.

11        Your Honor also did hear from Dr. Randall Braddom, the

12   expert, who said he's never in his life performed as many tests

13   on some of these patients as he had seen.

14        THE COURT:  Well, it does appear to me that the tests

15   were being agreed upon in advance as to what they would be

16   billed as between Mr. Dobrer and Mr. Vadim Chervin and with

17   Mr. Aron Chervin on the telephone, as I recollect it.  My

18   problem is whether Mr. Vadim Chervin's testimony that he

19   checked with other billers and other persons to determine

20   whether the amount charged was appropriate was deliberately --

21   well, I won't put it that way -- whether his testimony was

22   intentionally false or whether he convinced himself that he

23   couldn't have agreed in order -- before his testimony because

24   of the length of time that goes by between the crime and the

25   testimony in court is a difficult question for me.

D2ekches

1          So on both instances that the public wants me to find

2     an obstruction of justice, I do find that the testimony was

3     false in both instances, but I don't find that it was

4     intentionally false.

5          So the Court's finding that the guideline level is

6     Criminal History Category I and the offense level is 25, and

7     the guidelines call for a sentence of between 57 and 71 months.

8          Passing now to 18, United States Code, Section

9     3553(a) --

10         MR. HERNANDEZ:  Your Honor, if I can interrupt, I

11    think there is a formal motion for a departure that your Honor

12    has to decide.

13         THE COURT:  Oh, is there?  I'm sorry.  Of course there

14    is, because it's a motion under Johnson, and that's a

15    departure.  Thank you very much.

16         MR. HERNANDEZ:  Just to make sure you decide

17    procedurally.

18         THE COURT:  I don't know whether Mr. Cohn was making

19    it under the -- I lost track if he was making it under --

20         MR. COHN:  Every once in a while the government is

21    correct.  There was a motion.

22         THE COURT:  Well, the motion under the guidelines for

23    a departure, because of the children being adversely affected

24    by a sentence under the guidelines, I don't think Mr. Chervin

25    carried by a preponderance of the evidence.  Therefore, I'm

D2ekches

1    going to deny it.

2            First, the older boy is 18, he's truly virtually

3    independent, if he isn't independent totally.  I know he just

4    reached 18.  And I don't think there's a showing that the

5    younger boy's health would be adversely affected or

6    circumstances would be adversely affected.  There are a lot of

7    people who hold beliefs quite similar to those.  They mustn't

8    be a majority and they may be a smaller minority, but there are

9    a lot of people who hold beliefs similar to Ms. Chervin about a

10   greater person and a holistic remedies and things of that sort.

11   A lot of people believe in holistic remedies, a lot of people

12   believe in nontraditional medicine.  And when I say a lot, I

13   don't mean a huge percentage, but there are numbers of people,

14   particularly in our younger generation, who believe those

15   things.  I don't think that I can make a determination that

16   those people aren't fit parents.

17           If the family court judge finds differently, the

18   family court judge will find differently, and if the

19   circumstances of the issue being raised after conviction and at

20   this late date raise questions about -- although that isn't the

21   reason I make the finding.  I make the finding based on

22   circumstances that I just related, that a lot of people hold

23   views quite similar to the mother.  And they may be a small

24   minority, but I don't think that I can make a determination on

25   that basis.

D2ekches

1              Now, passing to 18, United States Code, Section

2    3553(a), the Court must consider the sentencing factors in

3    Section 3553(a)(2) to arrive at a sentence that is sufficient

4    but not greater than necessary to achieve the purposes as set

5    forth for sentencing in 3553(a)(2).  And that means that in

6    addition to the nature and circumstances of the offense and the

7    history and characteristics of the defendant, the Court must

8    consider the need for the sentence imposed:  To reflect the

9    seriousness of the offense; promote respect for the law and

10   provide just punishment for the offense; and to afford adequate

11   deterrence to criminal conduct; and to protect the public from

12   further crimes of the defendant; and to provide the defendant

13   with needed educational or vocational training, medical care,

14   or other correctional treatment in the most effective manner.

15              I don't think there were any applications based on the

16   last of those four categories.

17              The question is -- in view of the nature and

18   circumstances of the offense and the history and

19   characteristics of the defendant, and the need to reflect the

20   seriousness of the offense and to promote respect for the law

21   and provide just punishment for the offense, and to provide

22   adequate deterrence of criminal conduct and to protect the

23   public from further crimes of the defendant -- what the Court

24   should do.  In making that determination, I don't believe I

25   should take into account the prior conviction.

D2ekches

1          I'm going to sentence the defendant to the bottom of

2     the guideline count as charged, 53 months' imprisonment, as

3     recommended in the presentence report.  And so it's 57

4     months -- I'm sorry, 57 months of imprisonment on each count,

5     to run concurrently, three years of supervised release on each

6     count, to run concurrently, and a special assessment of $200.

7          I have no demand for restitution or forfeiture.

8          MR. HERNANDEZ:  There is a demand for forfeiture,

9     Judge.  We would ask that the same amount that was imposed on

10    Dr. Gibbs, to the amount of money that the two insurance

11    companies that you heard about during the trial, testified

12    about, paid $1,440,699.70, to be jointly and severally liable

13    with all the coconspirators in the case.

14         MR. COHN:  Just remember, your Honor, that Mr. Dobrer

15    testified that he promised $2 million in restitution, and that

16    should be credited.  There is no restitution.  You can't

17    charge -- Mr. Dobrer has agreed to pay it and you can't charge

18    that twice.

19         MR. HERNANDEZ:  It's referring to forfeiture only.

20         THE COURT:  How much in forfeiture?

21         MR. HERNANDEZ:  The forfeiture amount for Dr. Gibbs

22    was $1,440,699.70.

23         THE COURT:  How much for this gentleman?

24         MR. HERNANDEZ:  It should be the same amount, and they

25    should be jointly and severally liable because of the

D2ekches

1      conspiracy.

2                  THE COURT:  Will you submit a forfeiture order in that

3      amount?

4                  MR. HERNANDEZ:  Absolutely, yes, your Honor.

5                  THE COURT:  The mandatory conditions of supervised

6      release will apply; that is:  The defendant shall not commit

7      another federal, state or local crime; the defendant shall not

8      illegally possess a controlled substance; the defendant shall

9      not possess a firearm or destructive device; mandatory drug

10     testing is suspended due to the imposition of a special

11     condition requiring drug treatment and testing; the defendant

12     shall cooperate in the collection of DNA as directed by the

13     probation officer.

14                 Standard conditions of supervision will also apply --

15     that is, standard conditions 1 through 13 -- with the following

16     special conditions:  Defendant shall participate in a program

17     approved by the United States Probation Office, which program

18     may include testing to determine whether the defendant has

19     reverted to using drugs or alcohol.  The Court authorizes the

20     release of available drug treatment evaluations and reports to

21     the substance abuse treatment provider as approved by the

22     probation officer.  The defendant will be required to

23     contribute to the cost of services rendered -- that is,

24     co-payment -- in an amount to be determined by the probation

25     officer, based on his ability to pay or the availability of

D2ekches

 1    third-party payment.  The defendant shall not incur new credit

 2    charges or open additional lines of credit without the approval

 3    of the probation officer unless the defendant is in compliance

 4    with the installment payment schedule.  The defendant shall

 5    provide the probation officer with access to any requested

 6    financial information.  And the defendant shall submit his

 7    person, residence, place of business, vehicle or any other

 8    premises under his control to a search on the basis that the

 9    probation officer has reasonable belief that contraband or

10    evidence of a violation of the conditions of release might be

11    found.  The search must be conducted in a reasonable time and

12    in a reasonable manner.  Failure to submit to a search may be

13    grounds for revocation.  The defendant shall inform any other

14    residents that the premises may be subject to search pursuant

15    to this condition.

16            The defendant is to report to the nearest probation

17    office within 72 hours of release from custody, and be

18    supervised in the district of his residence.

19            The special assessment is $200 and shall be due --

20    does he have the $200?

21            MR. COHN:  I suspect he does, yes.

22            THE COURT:  All right.

23            MR. COHN:  Make it by the surrender date, whatever

24    that is, assuming you allow self-surrender.

25            THE COURT:  You're asking for self-surrender?

D2ekches

1              MR. COHN:  I am, your Honor.

2              THE COURT:  What is the government's position?

3              MR. HERNANDEZ:  No objection.

4              THE COURT:  How many days do you want then, Mr. Cohn?

5              MR. COHN:  I think designation sometimes takes about

6    six weeks.

7              THE COURT:  April 1st?

8              MR. COHN:  That's fine.  Will your Honor entertain a

9    motion to recommend a place of incarceration?

10             THE COURT:  Yes.

11             MR. COHN:  I ask for the camp at Otisville.  It's the

12   closest to his family, and I'm sure he meets the security

13   requirements.

14             THE COURT:  I will say in the New York greater

15   vicinity, to include Otisville, as the recommendation of the

16   Court.

17             MR. COHN:  Very good, your Honor.

18             THE COURT:  Self-surrender would be by April 1st,

19   2013.  And why don't I make the special assessment within 30

20   days --

21             MR. COHN:  Very good.

22             THE COURT:  -- $200.

23             You have 14 days to file a notice of appeal.  If you

24   have anything you wish to appeal about your conviction or this

25   sentence, Mr. Chervin, in order to do that, all you have to do

D2ekches

1   is send a letter to the United States, United States District

2   Court, Southern District of New York, and say, I appeal.  But

3   you must do that within the 14-day period.  If you send it in

4   later than the 14 days, the Court of Appeals will say that you

5   waived your right to appeal and they won't hear it.  So send it

6   in within the 14 days and that will protect your right.

7           MR. COHN:  We will file a notice of appeal for him by

8   early next week.

9           THE COURT:  Fine.

10          MR. COHN:  And he's indicated to me a desire to

11  appeal, and we'll take care of it.  And under Rule 4 of the

12  Court of Appeals, I have to do that.  So I'm doing it.

13          THE COURT:  All right.

14          Let me just say these words, Mr. Chervin:  I think

15  that you're a pretty smart man, and it's a shame that you got

16  yourself into this.  I don't want to get into it.  I don't

17  think I'll say anything more.  As you can see, I think that

18  you're -- I'm not going to say anything more.  Thank you.

19          MR. HERNANDEZ:  The government moves to dismiss the

20  open underlying indictments.

21          THE COURT:  All right.  The other counts will be

22  dismissed, of the underlying indictment.

23          MR. COHN:  Thank you, your Honor.

24          THE COURT:  OK.

25                              *  *  *